Xavier ROMEU, Plaintiff–Appellant,

Pedro Rosselló, Intervenor–Plaintiff–Appellant, in his official capacity as Governor of the Commonwealth of Puerto Rico,

v.

William S. COHEN, Secretary of Defense of the United States of America, William Jefferson Clinton, President of the United States of America, George Pataki, Governor of the State of New York & Carol Lee Sunderland, Commissioner of the Westchester County Board of Elections, Defendants–Appellees.

Docket Nos. 00–6303, 00–6287.

United States Court of Appeals, Second Circuit.

Argued Oct. 30, 2000.

Decided Sept. 6, 2001.

Xavier Romeu, Isla Verde, CA, Puerto Rico, plaintiff-appellant, pro se.

Angel E. Rotger Sabat, Attorney General of the Commonwealth of Puerto Rico, Gustavo A. Gelpi, Solicitor General, Rosa N. Russe Garcia, Deputy Solicitor General, and Irene S. Soroeta–Kodesh, Assistant Solicitor General, for intervenor-plaintiff-appellant Governor Pedro Rosselló.

Mary Jo White, United States Attorney for the Southern District of New York (by Daniel S. Alter and Gideon A. Schor, Assistant United States Attorneys), for defendants-appellees Secretary of Defense William S. Cohen and President William Jefferson Clinton.

Alan D. Scheinkman, Westchester County Attorney (by Stacey Dolgin Kmetz, Chief Deputy County Attorney, and Deborah A. Porder, Senior Assistant County Attorney), for defendant-appellee Carol Lee Sunderland, Commissioner of the Westchester County Board of Elections.

Eliot Spitzer, Attorney General of the State of New York (by Joel Graber, Assistant Attorney General), for defendant-appellee George Pataki, Governor of the State of New York.

Gregorio Igartua de la Rosa, amicus curiae in support of plaintiff-appellant.

Before WALKER, Chief Judge, OAKES, and LEVAL, Circuit Judges.

LEVAL, Circuit Judge:

Plaintiff appeals from the judgment of the United States District Court for the Southern District of New York (Shira A. Scheindlin, J.), dismissing his complaint for failure to state a claim. Plaintiff, a U.S. citizen residing in Puerto Rico who was formerly a resident of New York, asserts the right to vote for New York's presidential electors in the election held November 7, 2000. One theory of his complaint is that the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA") and the New York Election Law ("NYEL") violate the U.S. Constitution by extending the right to vote in a presidential election to U.S. citizens formerly domiciled in New York and now residing outside the United States, but not to U.S. citizens formerly domiciled in New York and now residing in a U.S. territory. *See* 42 U.S.C. §§ 1973ff–1 & 1973ff–6; N.Y. Elec. Law § 11–200(1) (McKinney 1998). Plaintiff contends also that these statutes have infringed his constitutional rights to vote and travel, and his rights under the Privileges and Immunities and Due Process Clauses. Finding no such violations, we affirm the judgment of the district court.

*Background*

Plaintiff-appellant Xavier Romeu, a natural born United States citizen, lived in Westchester County in New York State from 1994 through May 16, 1999. Romeu registered to vote and did vote in New York in the 1996 presidential elections, casting a ballot in Westchester County. On May 17, 1999, Romeu moved to and became a resident of the Commonwealth of Puerto Rico. On July 9, 1999, Romeu registered to vote in Puerto Rico. U.S. territories, including Puerto Rico, do not participate in presidential elections. Subsequently, Romeu requested an absentee ballot from the State of New York to vote in the 2000 presidential election.

State absentee ballot laws are governed, in part, by the Federal Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), which extends federal voting rights to U.S. citizens formerly citizens of a State who reside outside the United States. *See* 42 U.S.C. § 1973ff–1 to 1973ff–6. The Act preserves for a citizen

formerly resident in a State who moves outside the United States the right to vote in federal elections held in the citizen's previous State of residence. In relevant part, the UOCAVA provides that each "State" (a term defined under the Act to include U.S. territories) shall permit absentee "overseas" voters "to use absentee registration procedures and to vote by absentee ballot in general, special, primary, and runoff elections for Federal office" and requires States to "accept and process . . . any otherwise valid voter registration application from an absent . . . overseas voter, if the application is received by the appropriate State election official not less than 30 days before the election." 42 U .S.C. § 1973ff–1. The Act defines "overseas voter," in relevant part, as "a person who resides outside the United States and is qualified to vote in the last place in which the person was domiciled before leaving the United States" or "a person who resides outside the United States and (but for such residence) would be qualified to vote in the last place in which the person was domiciled before leaving the United States." 42 U.S.C. § 1973ff–6(5)(B) & (C). Under the statute's definition, a person who, like the plaintiff, resides in a U.S. territory does not qualify as an "overseas voter" because such a person does not reside "outside the United States." The UOCAVA further defines the term "State" to mean "a State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, the Virgin Islands, and American Samoa," so that a U.S. citizen living in a U.S. territory such as Puerto Rico who moves outside the United States retains whatever right to vote in elections for federal office that the citizen could have exercised had he or she continued to reside in that U.S. territory. 42 U.S.C. § 1973ff–6(6).

Carrying out the mandate of the UOCAVA, the New York Election Law ("NYEL") provides that a U.S. citizen "now residing outside the United States" whose most recent U.S. domicile was New York is entitled to vote as a "special federal voter," so long as "such citizen does not maintain a place of abode or domicile, is not registered to vote and is not voting in any other election district, state, territory or possession of the United States." N.Y. Elec. Law § 11–200(1) (McKinney 1998).[1]

Romeu received a standard form New York State absentee ballot application on September 27, 1999, from the Westchester County Board of Elections. Pursuant to the NYEL and the UOCAVA, Section 8 of the absentee ballot application form required Romeu to swear or affirm that he was "not . . . voting in any other U.S. State, territory or possession or subdivision thereof in the coming election(s)." Section 6 of the absentee ballot application form required that Romeu swear or affirm that he was in one of several categories of U.S. citizens living outside the United States, none of which included a U.S. citizen residing in a U.S. territory. As a U.S. citizen residing in a U.S. territory, Romeu

---

1. The statute provides as follows:

 Every citizen of the United States now residing outside the United States whose last domicile in the United States immediately prior to his departure from the United States was in the state of New York, shall be entitled to vote from such last domicile, as a special federal voter in all primary, special and general elections for the public offices or party positions of president and vice-president of the United States, United States senator, representative in congress and delegates and alternate delegates to a national convention, provided . . . that such citizen does not maintain a place of abode or domicile, is not registered to vote and is not voting in any other election district, state, territory or possession of the United States. . . .

 N.Y. Elec. Law § 11–200(1) (McKinney 1998).

was unable to swear or affirm either that he was not a voter in a U.S. territory, or that he was a U.S. citizen residing outside the United States.

Romeu brought this suit on March 24, 2000, seeking an order compelling the Westchester County election board to issue him a ballot and a declaratory judgment that the UOCAVA and the NYEL violate his constitutional rights. In particular, Romeu claimed violations of his constitutional rights to vote and to travel, his rights under the Privileges and Immunities Clause of Article IV, his Fourteenth and Fifth Amendment Due Process rights, and his rights to equal protection of the laws under the Fourteenth and Fifth Amendments. Pedro Rosselló, the then-Governor of Puerto Rico, intervened in support of Romeu's claims.

On cross-motions for judgment on the pleadings, the district court dismissed Romeu's claim. Although expressing the view that Romeu, as a citizen of the United States residing in Puerto Rico and denied the right to vote for the President of the United States, "is suffering a grave injustice," Judge Scheindlin found no violation of Romeu's constitutional rights primarily because the deprivation of which he complains is created by the Constitution.

Romeu filed an expedited appeal in this court. Because of the importance of speedy resolution of Romeu's appeal before the November 2000 presidential election, we summarily affirmed the order of the district court on October 31, 2000, noting that we would issue an opinion in due course setting out our reasoning. We now issue that opinion.

*Discussion*

■ In the Jones Act of 1917, also known as the Organic Act of 1917, Congress extended U.S. citizenship to persons then living in Puerto Rico, and to persons born in Puerto Rico thereafter. *See* Jones Act, 39 Stat. 951 (1917). For voting rights, however, the status of a U.S. citizen living in the U.S. territory of Puerto Rico is not identical to that of a U.S. citizen living in a State. Article IV of the Constitution empowers Congress "to dispose of and make all needful Rules and Regulations respecting the Territory ... belonging to the United States." U.S. Const. art. 4, § 3. In the *Insular Cases,* decided in 1901,[2] and in a series of subsequent decisions, the Supreme Court has held that because territories such as Puerto Rico belong to the United States but are not "incorporated into the United States as a body politic," *Dorr v. United States,* 195 U.S. 138, 143, 24 S.Ct. 808, 49 L.Ed. 128 (1904); *see also Balzac v. People of Porto Rico,* 258 U.S. 298, 304–05, 42 S.Ct. 343, 66 L.Ed. 627 (1922), Congress's regulation of the territories under Article IV is not "subject to all the restrictions which are imposed upon [Congress] when passing laws for the United States," *Dorr,* 195 U.S. at 142; *see also* José A. Cabranes, *Citizenship and the American Empire* 45–51 (1979); Juan R. Torruella, *The Supreme Court and Puerto Rico: The Doctrine of Separate and Unequal* 40–74 (1985). Congress's power in the territories is not unlimited; territorial regulations must comport with those basic principles "so fundamental [in] nature" that they form "the basis of all free government." *Downes v. Bidwell,* 182 U.S. 244, 291, 21 S.Ct. 770, 45 L.Ed. 1088 (1901) (White, J., concurring). But such princi-

2. *See Downes v. Bidwell,* 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088 (1901); *Armstrong v. United States,* 182 U.S. 243, 21 S.Ct. 827, 45 L.Ed. 1086 (1901); *Dooley v. United States,* 182 U.S. 222, 21 S.Ct. 762, 45 L.Ed. 1074 (1901); *De Lima v. Bidwell,* 182 U.S. 1, 21 S.Ct. 743, 45 L.Ed. 1041 (1901).

ples of fundamental justice do not incorporate all the mandates of the Bill of Rights. *See·Balzac,* 258 U.S. at 304–05, 42 S.Ct. 343; *Dorr,* 195 U.S. at 149, 24 S.Ct. 808; *Territory of Hawaii v. Mankichi,* 190 U.S. 197, 211, 217–18, 23 S.Ct. 787, 47 L.Ed. 1016 (1903).

■ Citizens living in Puerto Rico, like all U.S. citizens living in U.S. territories, possess more limited voting rights than U.S. citizens living in a State. Puerto Rico does not elect voting representatives to the U.S. Congress. It is represented in the House of Representatives by a Resident Commissioner who is "entitled to receive official recognition ... by all of the departments of the Government of the United States," but who is not granted full voting rights. *See* 48 U.S.C. § 891; *see also* Juan R. Torruella, *¿Hacia Dónde vas Puerto Rico?,* 107 *Yale L.J.* 1503, 1519–20 & n. 105 (1998) (reviewing José Trias Monge, *Puerto Rico: The Trials of the Oldest Colony in the World* (1997)). In addition, citizens residing in Puerto Rico do not vote for the President and Vice President of the United States. Indeed, the Constitution does not directly confer on any citizens the right to vote in a presidential election. Article II, section 1 provides instead that "[e]ach state shall appoint, in such manner as the legislature thereof may direct, a number of electors," whose function is to select the President. The Constitution thus confers the right to vote in presidential elections on electors designated by the States, not on individual citizens. *See Bush v. Gore,* 531 U.S. 98, 121 S.Ct. 525, 529, 148 L.Ed.2d 388 (2000). Accordingly, no U.S. citizen, whether residing in a State or territory or elsewhere, has an expressly declared constitutional right to vote for electors in presidential elections. *See McPherson v. Blacker,* 146 U.S. 1, 25, 13 S.Ct. 3, 36 L.Ed. 869 (1892) ("The clause under consideration does not read that the people or the citizens shall appoint, but that 'each state shall . . . .' ").

■ Despite the fact that the Constitution confers the power to appoint electors on States rather than on individual citizens, most U.S. citizens have a limited, constitutionally enforceable right to vote in presidential elections as those elections are currently configured. The States have uniformly exercised their Article II authority by delegating the power to appoint presidential (and vice-presidential) electors to U.S. citizens residing in the State to be exercised in democratic elections. In so delegating the power to appoint electors, States are barred under the Constitution from delegating that power in any way that "violates other specific provisions of the Constitution." *Williams v. Rhodes,* 393 U.S. 23, 29, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968); *see also Anderson v. Celebrezze,* 460 U.S. 780, 794–95 n. 18, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983).

■ U.S. citizens who are residents of Puerto Rico and the other U.S. territories have not received similar rights to vote for presidential electors because the process set out in Article II for the appointment of electors is limited to "States" and does not include territories. U.S. territories (including Puerto Rico) are not States, and therefore those Courts of Appeals that have decided the issue have all held that the absence of presidential and vice-presidential voting rights for U.S. citizens living in U.S. territories does not violate the Constitution. *See Igartua De La Rosa v. United States,* 32 F.3d 8, 9–10 (1st Cir. 1994) (per curiam) (*"Igartua I "*); *Attorney General of the Territory of Guam v. United States,* 738 F.2d 1017, 1019 (9th Cir.1984) ("Since Guam ... is not a state, it can have no electors, and plaintiffs cannot exercise individual votes in a presidential election."); *see also Igartua De La Rosa v. United States,* 229 F.3d 80, 83–85

(1st Cir.2000) (per curiam) ("*Igartua II*") (reaffirming the holding of *Igartua I* ).

■ The question we face here is a slightly different one—not whether Puerto Ricans have a constitutional right to vote for the President, but rather whether Equal Protection is violated by the UOCAVA, in that it provides presidential voting rights to former residents of States residing outside the United States but not to former residents of States residing in Puerto Rico. Like the First Circuit, we answer this question in the negative. *See Igartua I*, 32 F.3d at 10–11.

Plaintiff contends that because of the distinctions it draws among various categories of U.S. citizens, the UOCAVA is subject to strict scrutiny under the Equal Protection Clause. Defendants argue in response that application of strict scrutiny is inappropriate, and that the application of strict scrutiny is precluded by the Supreme Court's decision in *Harris v. Rosario*, 446 U.S. 651, 651–52, 100 S.Ct. 1929, 64 L.Ed.2d 587 (1980) (per curiam) (holding that under Article IV, section 3, Congress "may treat Puerto Rico differently from States so long as there is a rational basis for its actions"); *see also Califano v. Gautier Torres*, 435 U.S. 1, 3 n. 4, 98 S.Ct. 906, 55 L.Ed.2d 65 (1978) (per curiam) (suggesting that "Congress has the power to treat Puerto Rico differently and that every federal program does not have to be extended to it"). *But see Lopez Lopez v. Aran*, 844 F.2d 898, 913 (1st Cir.1988) (Torruella, J., concurring in part and dissenting in part).

■ Given the deference owed to Congress in making "all needful Rules and Regulations respecting the Territory" of the United States, U.S. Const. art. IV § 3, we conclude that the UOCAVA's distinction between former residents of States now living outside the United States and former residents of States now living

in the U.S. territories is not subject to strict scrutiny. As then-Judge Ginsburg observed in *Quiban v. Veterans Administration*, 928 F.2d 1154, 1160 (D.C.Cir. 1991), "[t]o require the government … to meet the most exacting standard of review … would be inconsistent with Congress's '[l]arge powers' [under Article IV] to 'make all needful Rules and Regulations respecting the Territory … belonging to the United States.' " *Id.* (citations omitted). We need not decide, however, the precise standard governing the limits of Congress's authority to confer voting rights in federal elections on former residents of States now living outside the United States while not conferring such rights on former residents of States now living in a U.S. Territory. For we conclude that regardless whether this distinction is appropriately analyzed under rational basis review or intermediate scrutiny, or under some alternative analytic framework independent of the three-tier standard that has been established in Equal Protection cases, *see Gautier Torres*, 435 U.S. at 3 n. 4, 98 S.Ct. 906 ("Puerto Rico has a relationship with the United States 'that has no parallel in our history.' " (quoting *Examining Bd. v. Flores de Otero*, 426 U.S. 572, 596, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976))), Congress may distinguish between those U.S. citizens formerly residing in a State who live outside the U.S., and those who live in the U.S. territories.

The distinction drawn by the UOCAVA between U.S. citizens moving from a State to a foreign country and U.S. citizens moving from a State to a U.S. territory is supported by strong considerations, and the statute is well tailored to serve these considerations. For one thing, citizens who move outside the United States, many of whom are United States military service personnel, might be completely excluded from participating in the election of gov-

ernmental officials in the United States but for the UOCAVA. In contrast, citizens of a State who move to Puerto Rico may vote in local elections for officials of Puerto Rico's government (as well as for the federal post of Resident Commissioner). In this regard, it is significant to note that in excluding citizens who move from a State to Puerto Rico from the statute's benefits, the UOCAVA treats them in the same manner as it treats citizens of a State who leave that State to establish residence in another State. Had Romeu left New York to become a resident of Florida, he would similarly not have been permitted to exercise the right created by the UOCAVA to vote in the federal elections conducted in New York. And if a citizen of Puerto Rico took up residence outside the United States, the UOCAVA would entitle that citizen to continue, despite her foreign residence, to participate in Puerto Rico's elections for the federal office of Resident Commissioner. Congress thus extended voting rights in the prior place of residence to those U.S. citizens who by reason of their move outside the United States would otherwise have lacked any U.S. voting rights, without similarly extending such rights to U.S. citizens who, having moved to another political subdivision of the United States, possess voting rights in their new place of residence. *See McDonald v. Board of Election Comm'rs,* 394 U.S. 802, 807, 809, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969) (upholding absentee voting statutes that were "designed to make voting more available to some groups who cannot easily get to the polls," without making voting more available to all such groups, on the ground that legislatures may "take reform 'one step at a time' " (quoting *Williamson v. Lee Optical of Oklahoma, Inc.,* 348 U.S. 483, 489, 75 S.Ct. 461, 99 L.Ed. 563 (1955))); *see also Bush v. Gore,* 531 U.S. 98, 121 S.Ct. 525, 550, 148 L.Ed.2d 388 (2000) (Gins-

burg, J., dissenting) (531 U.S. at ——, 121 S.Ct. at 539) (citing and quoting *McDonald* and *Williamson* ); *Katzenbach v. Morgan,* 384 U.S. 641, 657, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966) (applying to voting rights reform legislation the rule that "a statute is not invalid under the Constitution because it might have gone farther than it did" (internal quotation marks omitted)).

Moreover, if the UOCAVA had done what plaintiff contends it should have done—namely, extended the vote in federal elections to U.S. citizens formerly citizens of a State now residing in Puerto Rico while not extending it to U.S. citizens residing in Puerto Rico who have never resided in a State—the UOCAVA would have created a distinction of questionable fairness among Puerto Rican U.S. citizens, some of whom would be able to vote for President and others not, depending whether they had previously resided in a State. The arguable unfairness and potential divisiveness of this distinction might be exacerbated by the fact that access to the vote might effectively turn on wealth. Puerto Rican voters who could establish a residence for a time in a State would retain the right to vote for the President after their return to Puerto Rico, while Puerto Rican voters who could not arrange to reside for a time in a State would be permanently excluded.

In sum, the considerations underlying the UOCAVA's distinction are not insubstantial. As a result, we hold that Congress acted in accordance with the requirements of the Equal Protection Clause in requiring States and territories to extend voting rights in federal elections to former resident citizens residing outside the United States, but not to former resident citizens residing in either a State or a territory of the United States.

Nor do we find merit in plaintiff's other constitutional theories. The district court properly held that the constitutional right to vote is not violated by the statutes in question. New York may constitutionally require that New York voters reside in New York, subject of course to the provisions of the UOCAVA and the Supremacy Clause. *See Carrington v. Rash,* 380 U.S. 89, 91, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965) ("Texas has unquestioned power to impose reasonable residence restrictions [on] the availability of the ballot."). Romeu therefore has no claim to a constitutional right to vote in New York. And while the UOCAVA failed to extend to him the right to vote in New York, it did not deprive him of an existing right to vote. As explained above, Romeu cannot vote for the President in Puerto Rico because the existing laws do not confer such a voting right on U.S. citizens domiciled in Puerto Rico.

Nor is the right to travel violated by the UOCAVA and the NYEL. The Supreme Court has recently asserted that the right to travel is made up of "at least three different components. It protects [1] the right of a citizen of one State to enter and to leave another State, [2] the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State, and [3] for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State." *Saenz v. Roe,* 526 U.S. 489, 500, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999). Even assuming for purposes of this opinion that *Saenz*'s references to States were intended to encompass also territories and that the reference to the right to enter and leave a State includes also the right to change one's residence from one political subdivision of the United States to another, we find no violation of any of the components of the right to travel listed in *Saenz.* As to the first, New York has not impaired Romeu's right to travel to Puerto Rico. It is true that the UOCAVA and the New York statute have placed a cost on his becoming a permanent resident of Puerto Rico. On abandoning his residence in New York, he would have retained the right to vote in the presidential election had he moved to any place other than a U.S. territory. Had he moved outside the United States, he could have continued to vote in New York's presidential election. Had he moved to another State, he could have voted as a citizen of that State. His move to a U.S. territory, in contrast, required that he give up voting for the office of President. However, neither the NYEL nor the UOCAVA caused that loss. His loss of the right to vote for President is the consequence of his decision to become a citizen of a territory in a constitutional scheme that allocates the right to appoint electors to States but not to territories. His situation is not materially different from that of a New York citizen, prior to the passage of the UOCAVA, who decided to leave New York to reside in France. His doing so would involve giving up the right to vote in New York because participation in New York's elections was reserved to citizens of New York. New York's failure to offer Romeu the opportunity to continue to vote in its elections after his taking up residence in Puerto Rico no more violated his right to travel than did New York's failure under the pre-UOCAVA law to offer continued voting rights to its citizens who moved to France. A citizen's decision to move away from her State of residence will inevitably involve certain losses. She will lose the right to participate in that State's local elections, as well as its federal elections, the right to receive that State's police protection at her place of residence, the right to benefit from the State's welfare programs, and the

right to the full benefits of the State's public education system. Such consequences of the citizen's choice do not constitute an unconstitutional interference with the right to travel. *Cf. Gautier Torres*, 435 U.S. at 4–5, 98 S.Ct. 906 (holding that a federal cash benefit program for the aged, blind, and disabled did not violate the right to travel by applying only to U.S. citizens living in the fifty states and the District of Columbia, and thus excluding U.S. citizens living in Puerto Rico).

 The second and third components of the travel right are not implicated at all. Neither the UOCAVA nor the NYEL in any way impair Romeu's opportunity to be welcomed in Puerto Rico as a visitor or to be treated like other U.S. citizens residing in Puerto Rico upon his establishing residence there. Indeed, Romeu complains not that he is being treated differently from other U.S. citizens residing in Puerto Rico, but rather that he is being treated identically to them. By virtue of his former residence in New York, he seeks to be allowed to vote in the presidential election in a manner denied to other citizens of Puerto Rico. The denial of that special treatment does not constitute an unconstitutional burden on his right to travel.

 Finally, the Privileges and Immunities Clause of Article IV, which provides that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States," provides no avenue of redress. The Court in *Saenz* explained that the Privileges and Immunities Clause of Article IV establishes "the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in [a] second State."

*Saenz*, 526 U.S. at 500, 119 S.Ct. 1518. Assuming that the clause may apply to travel to territories,[3] the Privileges and Immunities Clause does not have the effect of allowing citizens to carry over to their new residence the privileges and immunities of their prior State of residence, but rather limits the capacity of other States (and perhaps territories) to treat such citizens differently than they treat their own citizens.

We conclude that Romeu has failed to plead a constitutional deprivation resulting from the failure of the UOCAVA and the NYEL to permit him to continue to vote in New York's federal election after his abandonment of his New York residence in favor of a Puerto Rico residence. We therefore affirm the judgment of the district court.

\* \* \*

The writer, speaking for himself alone and not for the court, adds a few observations on the problem of extending presidential votes to U.S. citizens residing in the territories. These, of course, do not constitute either a holding or observations of the Court.

The exclusion of U.S. citizens residing in the territories from participating in the vote for the President of the United States is the cause of immense resentment in those territories—resentment that has been especially vocal in Puerto Rico. *See Igartua II*, 229 F.3d at 85–90 (Torruella, J., concurring). In addition, this exclusion fuels annual attacks on the United States in hearings in the United Nations, at which the United States is described as hypocritically preaching democracy to the world

---

**3.** At the very least, it is clear that Congress has extended the Privileges and Immunities Clause to Puerto Rico by statute. *See* 48 U.S.C. § 737 ("The rights, privileges, and immunities of citizens of the United States shall be respected in Puerto Rico to the same extent as though Puerto Rico were a State of the Union and subject to the provisions of paragraph 1 of section 2 of article IV of the Constitution of the United States.").

while practicing nineteenth-century colonialism at home. *See, e.g., Special Committee on Decolonization Hears Petitioners on the Question of Puerto Rico,* United Nations Press Release GA/COL/2970, 19 June 1997. These problems of fairness, resentment, and impaired reputation in the community of nations are serious ones.

It has been widely assumed, because of the peculiar structure of the constitutional dictates relating to the election of the President, that U.S. citizens residing in Puerto Rico cannot be given a vote in the presidential election without either making Puerto Rico a State, or amending the Constitution in the manner of the Twenty–Third Amendment, which gave the District of Columbia the power to appoint presidential electors in the same manner as if it were a State. *See, e.g., Igartua II,* 229 F.3d at 83–84; *Igartua I,* 32 F.3d at 10 (stating that "[o]nly a ... constitutional amendment or a grant of statehood to Puerto Rico, therefore, can provide [U.S. citizens residing in Puerto Rico] the right to vote in the presidential election which they seek"); *Attorney General of Guam,* 738 F.2d at 1019 (stating that a "constitutional amendment would be required to permit [U.S. citizens living in Guam] to vote in a presidential election"); *Romeu v. Cohen,* 121 F.Supp.2d 264, 285 (S.D.N.Y. 2000) ("[O]nly statehood or a constitutional amendment can provide relief to the people of Puerto Rico."); H.R. No. 1698 (1960), 86th Cong., 2d Sess ., *reprinted in* 1–1960 U.S.C.C.A.N. 1459, 1460–61.

This assumption may be only partially correct. It is of course true that, absent either statehood or a constitutional amendment, Puerto Rican voters cannot have either a constitutionally guaranteed vote for the President, or a vote that functions identically with the votes of citizens residing in a State—for the election of a Puerto Rico delegation to the Electoral College. Nonetheless, the subject matter of this case and our focus on the UOCAVA suggest that statehood or a constitutional amendment may not be necessary prerequisites to permitting U.S. citizens residing in Puerto Rico or other territories to vote for the office of President.

It is true Article II, section 1 provides that "[e]ach State shall appoint [its slate of electors] in such Manner as the Legislature thereof may direct." Nonetheless, it has long been clear that State legislatures do not have unfettered authority over the appointment of electors. The Fourteenth and Fifteenth Amendments prohibit States from adopting a process of appointing electors that violates the Equal Protection Clause or abridges the right to vote "on account of race, color, or previous condition of servitude." The Nineteenth and Twenty–Sixth Amendments prohibit abridgments of the right to vote "on account of sex" or, for citizens 18 years of age or older, "on account of age." Each of these amendments empowers Congress to enforce their mandates against the States. *See* U.S. Const. amends. 14, 15, 19, & 26.

Pursuant to its authority to regulate the States' power to appoint electors, Congress has enacted voting rights legislation that suspends the use of literacy tests, *see* 42 U.S.C. §§ 1973b & 1973aa,[4] and strictly limits States' power to deny voting rights to U.S. citizens on the basis of their inability to read English when those citizens are

---

4. *See South Carolina v. Katzenbach,* 383 U.S. 301, 333–34, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966) (upholding suspension of literacy tests in Voting Rights Act of 1965); *Gaston County v. United States,* 395 U.S. 285, 89 S.Ct. 1720, 23 L.Ed.2d 309 (1969) (same); *Oregon v.* *Mitchell,* 400 U.S. 112, 118, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970) (opinion of Justice Black announcing judgment of Court upholding expanded prohibition of literacy tests in 1970 amendments to the Voting Rights Act).

educated in U.S. schools in which the predominant language is not English, *see* 42 U.S.C. § 1973b(e).[5] Congress has also required States and political subdivisions to provide bilingual voting materials. *See* 42 U.S.C. § 1973aa–1a.

Most important, Congress has required States to provide absentee ballot eligibility to former citizens of a State who leave the State and establish residence in another State within thirty days of a presidential election, *see* 42 U.S.C. § 1973aa–1(e), and has barred the States from establishing durational residency requirements for eligibility to vote in a Presidential election, *see* 42 U.S.C. §§ 1973aa–1(c). In *Oregon v. Mitchell,* 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970), the Supreme Court upheld Congress's power to ban State durational residency requirements and to require uniform absentee ballot eligibility, with eight justices concurring in the result, though split over the precise source of the authority in question.[6] Finally, the UOCAVA has imposed on States the obligation to accept the votes of their former citizens now residing abroad. *See* 42 U.S.C. § 1973ff–1. In both the requirement of mandatory absentee ballot eligibility for residents who have recently abandoned their residence, and the UOCAVA,

Congress has compelled States in their elections for presidential electors to accept voters who are not residents of the State.

If, notwithstanding the command of Article II, section 1 that electors be appointed in the manner that the State legislature directs, Congress may nonetheless impose on the States a requirement that each accept the votes of certain U.S. citizens who are not residents of the State but reside outside the United States or in other States, I can see no reason why Congress might not also with respect to the presidential election require the State to accept the presidential votes of certain U.S. citizens who are nonresidents of the State residing in the U.S. territories. At minimum, Congress might do so on the model of the UOCAVA by requiring States to accept the votes of U.S. citizens now residing in the territories who were formerly residents of the State. Indeed, even without congressional mandate, a State would no doubt have the power to pass statutes similar to the NYEL allowing its former residents now residing in a territory to participate in its federal elections. Furthermore, if the Constitution authorizes the UOCAVA and the other Congressional limitations outlined above on the

---

**5.** *See Katzenbach v. Morgan,* 384 U.S. 641, 658, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966) (upholding the "American-flag schools" provision of the Voting Rights Act).

**6.** Only Justice Harlan dissented from the Court's decision to uphold the durational residency provisions of the 1970 amendments to the Voting Rights Act. *See Mitchell,* 400 U.S. at 213–16, 91 S.Ct. 260 (Harlan, J., dissenting). Justice Black located Congress's authority to bar durational residency requirements and to create uniform absentee ballot guarantees in Congress's inherent "broad authority to create and maintain a national government." *See id.* at 134, 91 S.Ct. 260 (opinion of Justice Black). Justice Douglas rooted the authority in Section Five of the Fourteenth Amendment and Congress's power to

enforce what Justice Douglas styled "the right to vote for national officers." *See id.* at 147–50, 91 S.Ct. 260 (opinion of Justice Douglas). Justice Brennan, with whom Justice White and Justice Marshall joined, found Congress's authority in Congress's Section Five power to enforce the right to unhindered interstate travel. *See id.* at 236–39, 91 S.Ct. 260 (opinion of Justice Brennan). Justice Stewart, with whom Chief Justice Burger and Justice Blackmun joined, found it unnecessary to resort to Section Five of the Fourteenth Amendment and instead located Congress's power in its general authority under the Necessary and Proper Clause of Article IV to "protect and facilitate" the right to interstate travel. *See id.* at 285–87, 91 S.Ct. 260 (opinion of Justice Stewart).

power of the States to determine who may vote in its presidential elections, I see no reason in the Constitution why Congress might not impose a further requirement: Congress might permit every voting citizen residing in a territory to vote for the office of President by requiring every State that chooses its electors by popular vote (which all States do) to include in that State's popular vote the State's pro rata share of the votes cast by U.S. citizens in the territories.[7]

To be sure, Congress may legislate extended voting rights only in ways that are consistent with its enumerated constitutional powers. But if the UOCAVA is constitutional, and if Congress is within its powers in requiring a State to accept the votes of nonresidents in order to cure the problems of disqualifying former residents of a State who move outside the United States or who move their residence to another State without time to qualify to vote in that State's elections, I can see no reason why Congress would exceed its powers in requiring States to accept a proportionate share of the presidential votes of citizens of the territories to cure the presidential disenfranchisement of a substantial segment of the citizenry of the United States.[8] Indeed, given that Article IV, Section 3 of the Constitution gives Congress the power to "make all needful Rules and Regulations respecting the Territor[ies]," Congress's source of constitutional authority to extend the presidential vote to citizens residing in the territories is clearer than its power to enact the UOCAVA or the durational residency rules discussed in *Oregon.*[9]

7. For example: If U.S. citizens in the territories cast 1.3 million presidential votes, 54 percent for candidate X, and 46 percent for candidate Y, a State the size of New York (which has roughly 18 million residents as compared to 273 million residents in the fifty States combined (or 6.6 % of the total population of the fifty States), *see* United States Census Bureau, *Statistical Abstract of the United States: 2000,* at 23) would be allocated 85,800 votes from the territories, 46,332 for X and 39,468 for Y, adding a net total of 6864 votes in favor of X. This is but one of a number of different ways in which the votes of citizens domiciled in the territories might be allocated among the States. (Another way would be to allocate territorial votes according to a State's proportion of the total electoral votes rather than according to a State's proportion of the total population.)

8. Unlike the UOCAVA, of course, which applies to elections for all federal offices, *see* 42 U.S.C. § 1973ff-1, any such statute would necessarily be limited to the presidential election.

9. I offer three responses to the views expressed by Judge Walker. First, Judge Walker suggests that the allocation of territorial votes to the States has no basis in the Constitution. While I do not claim that the constitutional authority is clear, I make two points:

(a) if the UOCAVA and the durational residency requirement statutes have support in the Constitution—each obligating States to accept votes of nonresidents—I can see no reason why the statute I envision providing for proportionate allocation has any less constitutional basis; (b) Congress's authority may well reside in Article IV, § 3, which gives Congress the power to make "all needful Rules and Regulations respecting the Territor[ies]." While Judge Walker argues against the existence of such authority, stating that Congress's power under Article IV, § 3 is "not without limitations," he offers no very persuasive reason why those limitations stop short of such a statute, passed for the purpose of curing the disenfranchisement of the citizens of the Territories.

Second, Judge Walker asserts that because (in his view) a statute providing for proportionate allocation is not authorized by the Constitution, it follows that U.S. citizens residing in the Territories cannot constitutionally be authorized to vote for the president without either a constitutional amendment akin to the Twenty-Third Amendment, or the Territory becoming a State. This is a non sequitur. I have suggested two different ways in which residents of the Territories could be enfranchised to vote for presidential electors. The second is that the UOCAVA, enfranchis-

## Conclusion

The judgment of the district court is affirmed.

JOHN M. WALKER, Jr., Chief Judge, concurring:

I fully concur in Judge Leval's opinion for the court, but I write separately to take issue with his suggestion that "statehood or a constitutional amendment may not be necessary prerequisites to permitting U.S. citizens residing in Puerto Rico or [the] other territories[1] to vote for the office of President." *Ante* at 128 (Leval, *J.*, writing separately). *See also* Amber L. Cottle, Comment, *Silent Citizens: United States Territorial Residents and the Right to Vote in Presidential Elections*, 1995 U.

Chi. Legal. F. 315, pt. II.B. (1995). Judge Leval advances the following proposal: "Congress might permit every voting citizen residing in a territory to vote for the office of President by requiring every state that chooses its electors by popular vote (which all States do) to include in that State's popular vote the State's pro rata share of the votes cast by U.S. citizens in the territories" ("the Pro Rata Proposal"). *Id.* at 129-30 (Leval, *J.*, writing separately). Respectfully, I cannot agree with my colleague: I find no authority in the Constitution for the Congress (even with the states' consent) to enact such a provision.

"The Constitution creates a Federal Government of enumerated powers," *United States v. Lopez*, 514 U.S. 549, 552, 115

---

ing former residents of the States residing in foreign countries, could surely be constitutionally extended to apply to former residents of the States who reside in the Territories. Judge Walker's only answer to this is to suggest that the UOCAVA is also unconstitutional. But the durational residency statutes (which have the same potential infirmity in that they also require the States to accept the votes of nonresidents) were expressly upheld by the Supreme Court in *Oregon v. Mitchell*, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970). Judge Walker seeks to distinguish *Mitchell* and the durational residency rules as involving a congressional remedy for violations of the right to travel by the States. The statute upheld in *Mitchell*, however, does more than merely prohibit durational residency requirements as violations of the right to travel. It also provides that States must accept the votes of certain former residents, notwithstanding that a State does not violate the right to travel by requiring voters to be bona fide residents of the State. *See Dunn v. Blumstein*, 405 U.S. 330, 348–49, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972).

Third, Judge Walker suggests that, even if the UOCAVA is unconstitutional, a similar provision might be authorized relating solely to the votes of members of the armed services by virtue of those clauses in Article I, § 8 that authorize Congress to make rules with respect to the armed forces. Perhaps so. In any event, Article IV, § 3, which gives Congress

the power to make "all needful Rules and Regulations respecting the Territor[ies]," would provide no less constitutional authority to enact the statutes I envision.

1. In addition to the Commonwealth of Puerto Rico, the territories of the United States with permanent populations include the Territory of Guam, the Territory of the U.S. Virgin Islands, the Commonwealth of the Northern Mariana Islands, and the Territory of American Samoa. Through legislation, Congress has conferred U.S. citizenship on those born in Puerto Rico, *see* 8 U.S.C. § 1402, Guam, *see id.* § 1407, the U.S. Virgin Islands, *see id.* § 1406, and the Northern Mariana Islands, *see* 48 U.S.C. § 1801 (approving the "Covenant to Establish a Commonwealth of the Northern Mariana Islands," § 301 of which provides for U.S. citizenship). Those born in American Samoa, on the other hand, are not citizens but rather "American nationals." 8 U.S.C. § 1101(a)(21), (22). *See generally* Jonathan C. Drimmer, *The Nephews of Uncle Sam: The History, Evolution, and the Application of Birthright Citizenship in the United States*, 9 Geo. Immigr. L.J. 667, 700 (1995) (criticizing the fact that the Fourteenth Amendment's citizenship guarantee, which provides that "[a]ll persons born ... in the United States ... are citizens of the United States," has not been extended to the territories).

S.Ct. 1624, 131 L.Ed.2d 626 (1995); *see Gregory v. Ashcroft*, 501 U.S. 452, 457, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991), and it is on these enumerated powers that every congressional enactment having the force of law must rest. I can identify only four constitutionally enumerated powers that could arguably be candidates to support enactment of the Pro Rata Proposal: the Commerce Clause, § 5 of the Fourteenth Amendment, § 2 of the Fifteenth Amendment, and the Spending Clause.[2] However, as I shall explain, none of these provisions can support the Pro Rata Proposal.

As recent jurisprudence has made clear, the Commerce Clause is wholly deficient as a potential source of authority for Congress to mandate that the states accept the votes of U.S. citizens residing in the territories. First of all, a reasonable nexus to interstate commerce is lacking. *See United States v. Morrison*, 529 U.S. 598, 609, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000) (holding that, at a minimum, regulated activity must "substantially affect" interstate commerce); *United States v. Lopez*, 514 U.S. 549, 558–59, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (same). Second, even assuming an interstate commerce nexus

could be advanced, the Commerce Clause does not afford Congress the authority to "issue directives requiring the States to address particular problems, [or to] command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz v. United States*, 521 U.S. 898, 936, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997). "[S]uch commands are fundamentally incompatible with our constitutional system of dual sovereignty." *Id.; see also New York v. United States*, 505 U.S. 144, 162, 112 S.Ct. 2408 , 120 L.Ed.2d 120 (1992) ("While Congress has substantial powers to govern the Nation directly, including in areas of intimate concern to the States, the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' intentions."); *id.* at 166, 112 S.Ct. 2408 ("We have always understood that even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts."). I see no distinction between the Pro Rata Propos-

---

2. In his separate views, Judge Leval suggests that the Territorial Clause of Article IV, § 3, cl. 2, which provides that Congress has the power to "make all needful Rules and Regulations respecting the Territor[ies]," could also serve as a source of constitutional authority for Congress to require the states to accept a pro rata share of the votes of the territories.

While it is true that the Territorial Clause affords Congress substantial leeway to govern the territories, *Simms v. Simms*, 175 U.S. 162, 20 S.Ct. 58, 44 L.Ed. 115 (1899), that power is not without limitations. *See, e.g., Dorr v. United States*, 195 U.S. 138, 24 S.Ct. 808, 49 L.Ed. 128 (1904); *see also United States v. Verdugo–Urquidez*, 494 U.S. 259, 268–69, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990) ("Only fundamental constitutional rights are guaranteed to inhabitants of those territories."); *see generally* Jon M. Van Dyke, *The Evolving Legal Relationships Between the United States*

*and Its Affiliated U.S.-Flag Islands*, 14 U. Haw. L.Rev. 445, 453–71 (1992). The provision by its terms does not afford Congress the authority to impose requirements on the states in Congress's regulation of the territories. *See also* U.S. Const. amend. X (nondelegated powers are reserved to the states); U.S. Const. art. IV, § 3 (territory of a state cannot be changed without the consent of the concerned state's legislature); *Texas v. White*, 7 Wall. 700, 725, 19 L.Ed. 227 (1868) (holding unconstitutional Texas's attempted secession from the Union: "[T]he preservation of the States, and the maintenance of their governments, are as much within the design and care of the Constitution as the preservation of the Union and the maintenance of the National government. The Constitution, in all of its provisions, looks to an indestructible Union, composed of *indestructible States*." (emphasis added)).

al's mandate that state officials tabulate a share of the votes of the territories in federal elections and other constitutionally infirm federal mandates commandeering the states.

The Pro Rata Proposal would fare no better as an enactment under either § 5 of the Fourteenth Amendment or § 2 of the Fifteenth Amendment. Congress's authority under § 5, and presumably under § 2 as well,[3] is limited to (1) prohibiting conduct that itself violates the amendments' substantive guarantees and (2) remedying or deterring violations of these guarantees by "prohibiting a somewhat broader swath of conduct" than is otherwise unconstitutional, *Bd. of Trustees of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 121 S.Ct. 955, 963, 148 L.Ed.2d 866 (2001), subject to the requirement that there be a "congruence and proportionality between the [violation] to be prevented or remedied and the means adopted to that end." *City of Boerne v. Flores*, 521 U.S. 507, 520, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997); *see College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 673, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999) ("[T]he term 'enforce' [in § 5] is to be

taken seriously—... the object of valid § 5 legislation must be the carefully delimited remediation or prevention of constitutional violations.").

It could be argued that because a large segment of the population of the territories is Latino, black, or of Pacific Islander or Asian extraction, the exclusion of U.S. citizens residing in the territories from the vote for electors to the electoral college therefore has a disproportionately discriminatory effect. *Cf.* Jamin B. Raskin, *Is This America? The District of Columbia and the Right to Vote*, 34 Harv. C.R.-C.L. L.Rev. 39, 65–70 (1999). Of course, this does not make the enfranchisement of U.S. citizens residing in the territories a proper subject of congressional action under § 5 or § 2 because neither the Fourteenth Amendment nor the Fifteenth Amendment proscribes "discriminatory effects." Only *intentional* discrimination is barred by these amendments.[4] *See Mobile v. Bolden*, 446 U.S. 55, 63–64, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980); *Washington v. Davis*, 426 U.S. 229, 239–45, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *see, e.g., Voinovich v. Quilter*, 507 U.S. 146, 158, 113 S.Ct. 1149,

---

3. Although the Supreme Court has not yet articulated the standard for accessing the scope of Congress's authority under § 2 of the Fifteenth Amendment, the fact that both § 5 and § 2 by their terms provide Congress with only the "power to enforce" the substantive provisions of the Amendments strongly suggests that the limitations on Congress's authority under § 2 are similar to those under § 5. *See Bd. of Trustees of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 121 S.Ct. 955, 967 & n. 8, 148 L.Ed.2d 866 (2001) (discussing the Voting Rights Act of 1965, which was enacted by Congress under § 2 of the Fifteenth Amendment, as a model of "congruent and proportional" legislation). *But see City of Rome v. United States*, 446 U.S. 156, 176–77, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980) (suggesting legislative enactments under Congress's § 2 authority need only be "rational-

ly" related to "attacking the perpetuation of earlier, purposeful racial discrimination").

4. To be sure, Congress may strike at discriminatory effects with its § 2 authority as a *means* of deterring or remedying historic patterns of *intentional* state discrimination in the denial of the vote. *See, e.g., City of Rome*, 446 U.S. at 177, 100 S.Ct. 1548 ("Congress could rationally have concluded that, because electoral changes by jurisdictions with a demonstrable history of intentional racial discrimination in voting create the risk of purposeful discrimination, it was proper to prohibit changes that have a discriminatory impact."). This is of no moment here, however, because the denial of the vote to the territories, regardless of the disparate effects it may have, is *not* an *intentional* denial of the vote by the states, and therefore may not be deterred or remedied by Congress under § 2.

122 L.Ed.2d 500 (1993); *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 484–85, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982); *see also Garrett*, 531 U.S. 356, 121 S.Ct. 955, 967, 148 L.Ed.2d 866 (2001) ("Although disparate impact may be relevant evidence of racial discrimination, such evidence alone is insufficient even where the Fourteenth Amendment subjects state action to strict scrutiny." (internal citation omitted)); *see generally* Michael Selmi, *Proving Intentional Discrimination: The Reality of Supreme Court Rhetoric*, 86 Geo. L.J. 279, 309–17 (1997).

More significantly, the inability of U.S. citizens residing in the territories to vote for presidential electors is simply not a violation of either amendment, and therefore cannot be "remedied" under either § 5 or § 2.[5] To the contrary, the exclusion of the territories from the presidential-selection process is a deliberate product of our Constitution.[6] As our decision today states,

> The Constitution ... confers the right to vote in presidential elections on electors designated by the States, not on individual citizens.... The states have uniformly exercised their Article II authority by delegating the power to appoint presidential (and vice-presidential) electors to U.S. citizens residing in the states to be exercised in democratic elections.... U.S. citizens who are residents of Puerto Rico and the other U.S. territories have not received similar rights to vote for presidential electors because the process set out in Article II for the appointment of electors is limited to "states" and does not include territories. U.S. territories (including Puerto Rico) are not states, and therefore ... the absence of presidential and vice-presidential voting rights for U.S. citizens living in U.S. territories does not violate the Constitution.

*Ante* at 123-24 (paragraph breaks omitted).

The Spending Clause of Article I does not provide congressional authority to enact Judge Leval's Pro Rata Proposal either.[7] While "the power of Congress to

---

5. This differs from the situation where a U.S. citizen is actually residing in the state, but is denied the right to vote due to a durational residency requirement. In this latter instance, the Fourteenth Amendment's equal protection guarantee is offended if the period is significant because state residents are being treated differently in their access to the ballot box without a compelling state interest for the disparate treatment. *See Dunn v. Blumstein*, 405 U.S. 330, 336–37, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972). Therefore, Congress may remedy this constitutional violation through its authority under § 5. *See Oregon v. Mitchell*, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970).

6. Significantly, at the time the Constitution was drafted, the Continental Congress in New York was in control of the Northwest Territories. *See generally* Denis P. Duffey, Note, *The Northwest Ordinance as a Constitutional Document*, 95 Colum. L.Rev. 929, 929, 934–40 (1995). Yet, the Framers did not provide this territory with representation to the new federal government. This, I believe, suggests that the exclusion of territorial lands generally from the electoral college was not simply a historical oversight, but rather a conscious product of the constitutional design.

7. For the same reasons that I believe Judge Leval's proposal would exceed Congress's authority under the Commerce Clause and the enforcement clauses of the Fourteenth and Fifteenth Amendments, UOCAVA's directive to the states to extend the franchise in federal elections to non-resident U.S. citizens living overseas, *see* 42 U.S.C. §§ 1973ff–1, 1973ff–6(5)(C), appears constitutionally infirm. While Congress's authority under the Spending Clause might support UOCAVA's requirement that the states accept the votes of non-resident U.S. citizens living abroad, it does not appear to me that, at present, state adherence to this requirement is conditioned on the acceptance of federal monies.

authorize expenditure of public moneys for public purposes is not limited by the direct grants of legislative power found in the Constitution," the spending power is "not unlimited." *South Dakota v. Dole,* 483 U.S. 203, 207, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987) (internal quotation marks and citations omitted).

Under the Spending Clause, Congress may provide federal funds to a state in exchange for that state's acceptance of an attached condition. In this way, Congress and the state are essentially contracting parties, with the federal funds simply serving as consideration for the state's adherence to the condition. In so far as the Pro Rata Proposal might simply "require" a state to accept a share of the votes from the territories without the state's consent, it could not be supported under the Spending Clause.

Even if the Pro Rata Proposal were conditioned on state consent as the Spending Clause requires, it could still not be sustained under Congress's spending authority. For Congress to exercise its spending authority validly, the state government must have the authority, both under the Federal Constitution and the state's constitution, to agree to the particular condition. *See Dole,* 483 U.S. at 207–08, 107 S.Ct. 2793 (noting that "other constitutional provisions may provide an independent bar to the conditional grant of federal funds"). It is plain that the Federal Constitution does not afford a state government the authority to "accept a proportionate share of the presidential votes of citizens of the territories." *Ante,* at 130 (Leval, *J.,* writing separately); *cf. New York,* 505 U.S. at 181, 112 S.Ct. 2408 (stating that the states cannot consent to "depart[ures] from the constitutional plan").

To fully understand why, one need simply consider the structural effect of the Pro Rata Proposal: under it, a state would in essence "share" with the territories (albeit on a pro rata basis) its authority to select electors. Yet, Article II, § 1 of the Federal Constitution provides that the "*State* shall appoint" "a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress." U.S. Const. art. II, § 1 (emphasis added). The text is both clear and obligatory: the selection of a state's electors is to rest with the "State," either through the people directly or through the state legislature. Thus, this power may not be shared, pooled, or otherwise diluted even with a state's consent.

The Constitution having assigned the authority to select electors to the states exclusively, neither the Congress nor the officials of the states may, consistent with the Supremacy Clause, alter that scheme.[8]

It is possible, however, that those provisions of UOCAVA governing military voting, *see* 42 U.S.C. § 1973ff–1(1) & (2), may well be a "necessary and proper" exercise of Congress's authority to provide for an army and navy, *see* U.S. Const. art. I, § 8, cls. 12–14, 18, by ensuring that military personnel are not disenfranchised by virtue of their "active duty" service away from their "place of residence," *see* 42 U.S.C. § 1973ff–6(1)(A).

**8.** In *Igartua De La Rosa v. United States,* 32 F.3d 8, 10 n. 1 (1995) (per curiam), the plaintiffs, who were U.S. citizens residing in Puerto Rico, argued that their right to vote in the presidential election is secured by Article 25 of the International Covenant on Civil and Political Rights, 6 I.L.M. 368 (1967), which the United States has ratified. Article 25 provides in pertinent part:

> Every citizen shall have the right and the opportunity, ... without unreasonable restriction[ ] ... to vote ... at genuine periodic elections which shall be universal and equal suffrage....

Presently, Article 25 is not self-executing, *see* Cong. Rec. S4784 (daily ed. Apr. 2, 1992),

*See generally* 1 Laurence H. Tribe, *American Constitutional Law* § 6–1, at 1024 (3d ed. 2000) ("[T]here are Union-reinforcing restrictions that flow from the Constitution's structure alone, without any reliance upon grants of power to Congress, and that are clearly as binding on Congress as on the states. Such restrictions include ... the principle that neither the states nor Congress may reshape the relationships specified in the Constitution between citizens of the nation and their federal representatives."); *id.* § 6–35, at 1246 ("[S]ome federalism-based limits on state action reflect structural considerations so basic to the nature and cohesion of the Union that Congress should be no more empowered to waive those limits than the states are authorized to transgress them.").

My belief that Judge Leval's proposal would be constitutionally infirm does not undermine the concern I share with him that the U.S. citizens residing in the territories are not being afforded a meaningful voice in national governance.[9] *See generally* T. Alexander Aleinikoff, *Puerto Rico and the Constitution: Conundrums and Prospects,* 11 Const. Comment. 15, 43 (1994). However, I see only two remedies afforded by the Constitution: (1) statehood for each of the territories, *see* U.S. Const. art. IV, § 3, or (2) a constitutional amendment providing the territories with voting representatives to Congress and the electoral college.[10]

and therefore cannot be privately enforced. *See Igartua De La Rosa,* 32 F.3d at 10 n. 1.

Assuming for the sake of discussion that the voting status of the territories does violate Article 25, the question arises whether, in order to comply with our treaty obligations under Article 25, Congress could implement the Pro Rata Proposal under the Treaty Clause of Article II, § 2. I believe the answer is plainly "no." While the scope of Congress's authority under the Treaty Clause is separate and independent of its other enumerated powers, *see, e.g., Missouri v. Holland,* 252 U.S. 416, 433–34, 40 S.Ct. 382, 64 L.Ed. 641 (1920) (Holmes, *J.*), it (like Congress's spending power) cannot be used to alter the structural relationships enshrined in the Constitution, something the Pro Rata Proposal would plainly do. *See* U.S. Const. art. VI (providing that the Constitution is the "Supreme Law of the Land"); *Reid v. Covert,* 354 U.S. 1, 16–17, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1956) (plurality opinion); *Igartua De La Rosa,* 32 F.3d at 10 n. 1.

9. Notably, the D.C. Circuit has held that the House of Representatives' may permit the territorial delegates to the House limited voting authority. *See Michel v. Anderson,* 14 F.3d 623, 632 (D.C.Cir.1994). *But see generally* Jamin B. Raskin, *Is There a Constitutional Right to Vote and Be Represented?: The Case of the District of Columbia,* 48 Am. U.L.Rev. 589, 592 (1999) (arguing that the "Constitution fully protects the right to vote and be represented in national government for every community of American citizens taxed, drafted, and governed by our institutions").

10. This view was also expressed by the First Circuit in *Igartua De La Rosa,* 32 F.3d at 10:
The only jurisdiction, not a state, which participates in the presidential election is the District of Columbia, which obtained that right through the twenty-third amendment to the Constitution.... Only a similar constitutional amendment or a grant of statehood to Puerto Rico, therefore, can provide appellants the right to vote in the presidential election which they seek.