# Views on Legislation Making the District of Columbia a Congressional District

The District of Columbia Voting Rights Act of 2009 is unconstitutional.

Congress may not by statute give the District of Columbia voting representation in the House.

The District of Columbia is not a "State" within the meaning of the Composition Clause, which governs the membership of the House of Representatives.

The District Clause gives Congress broad power to legislate for the District, but it does not permit Congress to override the prescriptions of the Composition Clause.

February 25, 2009

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

We have prepared the attached letter for transmittal to the Counsel to the President.* The letter elaborates on comments the Office of Legal Counsel, at the request of the Office of Management and Budget, recently provided on H.R. 157 and S. 160, the House and Senate versions of the District of Columbia Voting Rights Act of 2009. *See* E-mail for Adrien Silas, Office of Legislative Affairs, from David Barron, Acting Assistant Attorney General, Office of Legal Counsel, *Re: H.R. 157 and S. 160, D.C. House Voting Rights* (Feb. 9, 2009). We have also prepared for transmittal the attached executive summary of the constitutional analysis set forth in the letter.

DAVID J. BARRON
*Acting Assistant Attorney General*
*Office of Legal Counsel*

---

* Editor's Note: The Attorney General provided a different memorandum opinion to the Counsel to the President. *See Constitutionality of the D.C. House Voting Rights Act of 2009*, 33 Op. O.L.C. 38 (2009).

EXECUTIVE SUMMARY

The attached letter addresses the constitutionality of the District of Columbia Voting Rights Act of 2009, which would give the District of Columbia one voting member in the House of Representatives. The key provision of the two bills now pending in Congress states: "Notwithstanding any other provision of law, the District of Columbia shall be considered a Congressional district for purposes of representation in the House of Representatives."

In recent years, this Office has twice concluded that essentially identical legislation was unconstitutional. *See Constitutionality of the D.C. Voting Rights Act of 2007*, 31 Op. O.L.C. 147 (2007) (statement of John P. Elwood, Deputy Assistant Attorney General, Office of Legal Counsel); E-mail for Velma Taylor, Office of Legislative Affairs, from Michelle Boardman, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: H.R. 5388, the District of Columbia Fair and Equal House Voting Rights Act of 2006* (May 22, 2006). Although Congress had never until recently sought to give the District voting representation without statehood, our analysis of related questions for at least 40 years makes clear that our recent conclusions reflect the consistent and longstanding view of the Office.

We have carefully reviewed the arguments that have been advanced in support of the pending legislation, and we now reaffirm the Office's earlier conclusion. In so doing, we are mindful of the exceptionally strong policy reasons for extending congressional voting rights to citizens of the District. We further recognize that, in light of those policy considerations, it has been argued that any doubts concerning the constitutionality of the pending legislation should, if reasonably possible, be resolved in favor of Congress's authority to give citizens of the District a voice in the national legislature. After conducting a careful and thorough review of all relevant authorities, however, we conclude that the legislation is clearly unconstitutional even under that demanding standard.

Constitutional text, structure, original understanding, historical practice, and judicial precedent support this Office's longstanding view. The key constitutional provision is the Composition Clause, which governs the

157

membership of the House of Representatives. The Clause provides: "The House of Representatives shall be composed of members chosen every second year by the people of the several states, and the electors in each state shall have the qualifications requisite for electors of the most numerous branch of the state legislature." U.S. Const. art. I, § 2, cl. 1. The repeated textual references to "states" or "state" in this Clause, when combined with the numerous constitutional provisions relating to federal elections that similarly restrict voting to "states" and their people, reflect a clear intention to exclude non-state entities, such as the District, unless the Constitution expressly provides otherwise. See U.S. Const. amend. XXIII, § 1 (The District "shall appoint . . . [a] number of electors of President and Vice President equal to the whole number of Senators and Representatives in Congress to which the District would be entitled *if it were a State*, but in no event more than the least populous State; they shall be *in addition to those appointed by the States*, but they shall be considered, *for the purposes of the election of President and Vice President*, to be electors appointed by a State; and they shall meet in the District and perform such duties as provided by the twelfth article of amendment.") (emphasis added). Our conclusion is reinforced by powerful evidence that the Framers regarded states as uniquely important components of the federal constitutional structure. *See Adams v. Clinton*, 90 F. Supp. 2d 35, 56 (D.D.C. 2000) ("The Constitution's repeated references to states . . . are reflections of the Great Compromise forged to ensure the Constitution's ratification. There is simply no evidence that the Framers intended that not only citizens of states, but unspecified others as well, would share in the congressional franchise."). It is further confirmed by Founding-era statements and subsequent historical practice.

Recent judicial authority affirms this same conclusion. In a thorough and thoughtful opinion, a special three-judge panel of the United States District Court for the District of Columbia relied on similar evidence from text, history, and precedent to conclude that the District of Columbia is not a "state" within the meaning of the Composition Clause. *Adams*, 90 F. Supp. 2d at 55–56 ("In sum, we conclude that constitutional text, history, and judicial precedent bar us from accepting plaintiffs' contention that the District of Columbia may be considered a state for purposes of congressional representation under Article I."). That decision was summarily affirmed by the Supreme Court. *Adams v. Clinton*, 531 U.S. 941

(2000); *see also Hicks v. Miranda*, 422 U.S. 332, 344–45 (1975) (summary affirmance is a precedential ruling on the merits).

Conceding that the District is not a "State" within the meaning of the Composition Clause, some have argued that Congress may evade the strictures of that Clause by invoking its power to "exercise exclusive legislation in all cases whatsoever" over the District." *See* U.S. Const. art. I, § 8, cl. 17. *Adams* did not directly address this argument, but the reliance on Congress's authority under the District Clause to support District voting representation in the House is not persuasive. The District Clause gives Congress broad power to provide for the governance of the District, but it does not allow Congress to "contravene any provision of the Constitution." *Palmore v. United States*, 411 U.S. 389, 397 (1973) (quoting *Capital Traction Co. v. Hof*, 174 U.S. 1, 5 (1899)); *accord Keller v. Potomac Elec. Co.*, 261 U.S. 428, 443–44 (1923). Nor can the Composition Clause reasonably be read to permit Congress to treat the District as a "State" for purposes of representation in the House. Indeed, if it could be so read, we see no principled basis for concluding that Congress could not, by statute, give territories voting representation in the House as well.

In arguing to the contrary, proponents of the pending legislation rely heavily on *National Mutual Insurance Co. v. Tidewater Transfer Co.*, 337 U.S. 582 (1949). That case held Congress may give Article III courts jurisdiction over suits brought by citizens of the District of Columbia against citizens of the several states, even though Article III expressly confers diversity jurisdiction only over cases involving residents of "States." Thus, the proponents of this legislation contend, the Composition Clause similarly should not prevent Congress from giving the District voting representation in the House, even though that Clause refers only to "States" and not the District. As we explain in our letter, however, *Tidewater Transfer* is not persuasive authority for that proposition. Indeed, a close examination reveals that the two opinions supporting the judgment in that case (neither of which drew support from more than three Justices) do not support it. The other relevant judicial precedents provide further support for our conclusion.

In sum, we conclude that Congress may not by statute give the District of Columbia voting representation in the House. The relevant constitu-

tional text, original understanding, historical practice, and judicial prece-
dent all clearly support the proposition that the District is not a "State"
within the meaning of the Composition Clause. The District Clause gives
Congress broad power to legislate for the District, but it does not permit
Congress to override the prescriptions of the Composition Clause.

LETTER

At the request of the Office of Management and Budget, the Office of
Legal Counsel recently provided comments on H.R. 157 and S. 160, the
House and Senate versions of the District of Columbia Voting Rights Act
of 2009. *See* E-mail for Adrien Silas, Office of Legislative Affairs,
from David Barron, Acting Assistant Attorney General, Office of Legal
Counsel, *Re: H.R. 157 and S. 160, D.C. House Voting Rights* (Feb. 9,
2009). In those comments, the Office set forth its conclusion that this
legislation is unconstitutional and offered to provide a further elaboration
of its reasoning upon request. I am now writing in response to your of-
fice's request for a more detailed explanation of the basis for our constitu-
tional conclusion and further consideration of the constitutional argu-
ments of the proponents of the legislation. We have also enclosed a
separate, executive summary of our analysis for your convenience.

H.R. 157 and S. 160 would give the District of Columbia one voting
member in the House of Representatives. In particular, each bill includes
a provision stating: "Notwithstanding any other provision of law, the
District of Columbia shall be considered a Congressional district for
purposes of representation in the House of Representatives." H.R. 157,
§ 2(a); S. 160, § 2(a). Significantly, neither bill purports to grant the
District statehood. Instead, each bill would grant the citizens of the Dis-
trict the authority to elect a voting member of the House of Representa-
tives by identifying it as a congressional district in its own right.

In recent years, this Office has twice concluded that essentially iden-
tical legislation was unconstitutional. *See Constitutionality of the D.C.
Voting Rights Act of 2007*, 31 Op. O.L.C. 147, 147 (May 23, 2007) ("*D.C.
Voting Rights Act*") (statement of John P. Elwood, Deputy Assistant
Attorney General, Office of Legal Counsel) ("S. 1257 violates the Consti-
tution's provisions governing the composition and election of the United
States Congress."); E-mail for Velma Taylor, Office of Legislative Af-

fairs, from Michelle Boardman, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: H.R. 5388, the District of Columbia Fair and Equal House Voting Rights Act of 2006* (May 22, 2006) ("We conclude that the creation of a District of Columbia seat by this legislation is unconstitutional. Membership in the House of Representatives is limited to representatives elected by the people of the several States, and the District of Columbia is not a State."). And although until recently Congress had never sought to give the District voting representation without statehood, our analysis of related questions for at least 40 years makes clear that our recent conclusions reflect the consistent and longstanding view of the Office. *See, e.g.*, Letter for Benjamin Zelenko, Committee on the Judiciary, House of Representatives, from Martin F. Richman, Acting Assistant Attorney General, Office of Legal Counsel (Aug. 11, 1967) (explaining that "provisions for elections of Senators and Representatives in the Constitution are stated in terms of the States, and the District of Columbia is not a State"); Memorandum for Warren Christopher, Deputy Attorney General, from Frank M. Wozencraft, Assistant Attorney General, Office of Legal Counsel, *Re: Budget, Economic, and State of the Union Messages* (Oct. 16, 1968) (same); *District of Columbia Representation in Congress: Hearing on S.J. Res. 65 Before the Subcomm. on the Constitution of the S. Comm. on the Judiciary*, 95th Cong. 16–29 (1978) (testimony of John M. Harmon, Assistant Attorney General, Office of Legal Counsel) (stating that, "[i]f the District is not to be a state, then an amendment [to the Constitution] is required" to give the District voting representation in Congress, as "we do not believe that the word 'state' as used in Article I can fairly be construed to include the District under any theory of 'nominal statehood'").

We have carefully reviewed the arguments that have been advanced in support of the pending legislation, and we now reaffirm the Office's earlier conclusion. In so doing, we are mindful of the strong policy considerations that have been advanced in support of the extension of congressional voting rights to citizens of the District. There is no denying the force of the considerations in favor of enfranchising District residents. *See, e.g.*, *Loughborough v. Blake*, 18 U.S. 317, 324 (1820) (conceding that "in theory it might be more congenial to the spirit of our institutions to admit a representative from the district," but omitting any suggestion that Congress might provide such representation by simple legislation);

*Adams v. Clinton*, 90 F. Supp. 2d 35, 66 (D.D.C. 2000) ("We do not disagree that defendants have failed to offer a compelling justification for denying District residents the right to vote in Congress."). We are also aware that some have argued that these policy considerations are implicit in the constitutional structure and that, in consequence, Congress should be assumed to have the authority to enact the pending legislation unless the Constitution clearly prohibits it. *See* Peter Raven-Hansen, *Congressional Representation for the District of Columbia: A Constitutional Analysis*, 12 Harv. J. on Legis. 167, 191 (1975) ("If no constitutional purpose is served by exclusion of the District, the broader principles of representative government which the Constitution is meant to effect favor making the District a nominal state for purposes of congressional representation."); *accord Ending Taxation Without Representation: The Constitutionality of S. 1257: Hearing Before the S. Comm. on the Judiciary*, 110th Cong. 18–22 (May 23, 2007) (S. Hrg. No. 110-440; Serial No. J-110-38) (statement of Patricia Wald) ("Wald Statement"). Our view, however, is that this proposed legislation would be unconstitutional even if such a clear statement rule were appropriate in this context.

We begin by explaining that Section 2 of Article I of the Constitution, known as the Composition Clause, bars Congress from giving the District of Columbia the authority to elect a voting member of the House of Representatives unless and until the District becomes a state.[1] This conclusion follows from the plain text of the Constitution and draws additional support from founding-era understandings, subsequent historical practice, and judicial precedent. In the course of our discussion, we consider the main arguments that have been offered as to why the text and the historical evidence are not as clear as we believe them to be. We next consider the arguments, offered by some prominent defenders of the proposed legislation, and similar versions of it, that the District of Columbia Clause in Article I authorizes Congress to grant the District voting representation in the House, notwithstanding the Composition Clause. Two of these arguments merit particular consideration: (1) that Congress's so-called "plenary" power under the District Clause, U.S. Const. art. I, § 8, cl. 17, is such

---

[1] We wish to be clear that although this Office has in the past opined that District citizens' voting rights can only be effected by constitutional amendment, we do not address here whether and how Congress may, by statute, confer statehood on the District.

that it may give the District the authority to elect a voting member of the House even though the District is not a state, and cannot be treated as one, for purposes of the Composition Clause; and (2) that Congress possesses a more specific authority under the District Clause to treat the District as a "state" for purposes of the Composition Clause, even if Congress does not formally confer statehood on the District. We have carefully reviewed each of these arguments and find neither to be sound. Accordingly, we conclude that the proposed legislation is unconstitutional and therefore reaffirm the Office's consistent position that Congress may not give District residents the authority to elect a voting member of the House of Representatives, such as by denominating the District a "congressional district," because the District is not a state.

## I.

We begin our analysis with a consideration of the text of the constitutional provision governing the composition of the House of Representatives. This provision, known as the Composition Clause, provides in full: "The House of Representatives shall be composed of members chosen every second year by the people of the several states, and the electors in each state shall have the qualifications requisite for electors of the most numerous branch of the state legislature." U.S. Const. art. I, § 2, cl. 1.

It has been suggested that by providing that voting members of the House be chosen by "the people of the several states," the Clause supplies a plausible textual basis for concluding that Congress may give the District voting representation in the House, even though the District is not a state. *See, e.g.*, Wald Statement at 19 ("[I]t is the House that has been identified as deriving its power from the people and not necessarily from the States."); *see also* Sen. Orrin G. Hatch. *"No Right is More Precious in a Free Country": Allowing Americans in the District of Columbia to Participate in National Self-Government*, 45 Harv. J. on Legis. 287, 304 (2008) (arguing that the Constitution allows Congress by statute to give the District voting representation in the House but not in the Senate because "the House was designed to represent people, whereas the Senate was designed to represent states"). The argument is that the Clause confers authority on "the people" rather than on the states, and so residents of the District—part of "the people" of the United States as a whole—are not

excluded from the scope of the Clause. This argument is reinforced by those who contend that the use of the word "states" in the Clause should not be deemed preclusive of constituencies that might encompass the District. *See Adams*, 90 F. Supp. 2d at 97 (Oberdorfer, J., dissenting) (concluding that "the literal references to the 'States' in Article I do not necessitate denying to the people of the District the right to vote for voting representation in the House of Representatives"); *id*. at 87 ("In essence, the defendants would apply the maxim *expressio unius est exclusio alterius*—the expression of one thing is the exclusion of another—as the basis for interpreting the term 'State.' . . . As the Supreme Court has explained, 'The "exclusio" is often the result of inadvertence or accident, and the maxim ought not to be applied, when its application, having regard to the subject-matter to which it is to be applied, leads to inconsistency or injustice.'" (citation omitted)).

The text, however, does not bear this construction, particularly when considered in context and in light of the constitutional structure. The language itself seems clear in limiting the right to choose "members" of the House to people from states.[2] Certainly nothing in the text of the Composition Clause indicates that the people of an entity other than a state may do so. The Composition Clause commands that representatives be chosen by "the people of the several states," not by "the people of the United States." U.S. Const. art. I, § 2, cl. 1. As such, the reference to "the people" must be read in connection with the language that follows ("of the several states"). For that reason, the language does not naturally suggest the possibility that "people" who are citizens of non-state entities—such as, for instance, the citizens of federal territories or of the District—would have a constitutional right to choose House representatives. Instead, the reference to "the people" is best read to underscore that members of the House would be selected by popular vote within "the several states" whereas members of the Senate would be selected (prior to the adoption of the Seventeenth Amendment) by state legislatures. It is this critical distinction that underlies the familiar description of the House of Representatives as "the people's house."

---

[2] For purposes of this letter we use the term "members" to refer to voting members, where not otherwise modified, as the District of Columbia has a delegate to the House.

Further language in the Composition Clause underscores the conclusion that only the people of a state are empowered to choose members of the House. Immediately after providing that members of the House shall be chosen by "the people of the several States," the Clause directs that the electors in House elections "shall have the qualifications requisite for electors of the most numerous branch of the *state legislature*." U.S. Const. art. I, § 2, cl. 1 (emphasis added). "[F]or most of its history," however, "the District of Columbia has had nothing that could even roughly be characterized as a legislature for the entire District." *Adams*, 90 F. Supp. 2d at 47; *see also id*. at 49 ("The impossibility of treating Congress as the legislature under that clause is manifest, as doing so would mean that Congress would itself choose the District's senators."). Likewise, the same section of Article I provides: "When vacancies happen in the representation from any State, the executive authority thereof shall issue writs of election to fill such vacancies." As the *Adams* court explained, this provision would be anomalous as applied to the District. Leaving aside the fact that the Mayor of the District is a relatively recent office, "it is Congress that is the ultimate executive authority for the District." *Id*. at 49. And "[t]he possibility that the Framers intended Congress to fill its own vacancies seems far too much of a stretch, even if the constitutional fabric were more flexible than it appears to be." *Id*.; *see also* U.S. Const. art. I, § 2, cl. 2 ("No person shall be a Representative . . . who shall not, when elected, be an inhabitant of that *State* in which he shall be chosen.") (emphasis added).

Nor is this textual conclusion rooted merely in the provisions of the original compact and thus perhaps the consequence of an outdated construction that has been overtaken by understandings that have developed over time. It is confirmed by a much more recent constitutional development. Section 1 of the Twenty-Third Amendment, ratified in 1961, provides that the District "shall appoint . . . [a] number of electors of President and Vice President equal to the whole number of Senators and Representatives in Congress to which the District would be entitled *if it were a state*, but in no event more than the least populous state; they shall be *in addition to those appointed by the states*, but they shall be considered, *for the purposes of the election of President and Vice President*, to be electors appointed by a State; and they shall meet in the District and perfonn such duties as provided by the twelfth article of amendment."

This text would serve no purpose if the District were already a state for purposes of constitutional provisions governing federal elections.

We are aware of the argument that the Twenty-Third Amendment is not as significant as it would appear to be. Judge Oberdorfer, for example, has argued in dissent in *Adams* that "the suggestion that the understanding of the people adopting a constitutional amendment in 1961 could confirm the 1787 understanding of the Framers of the Constitution appears to have no precedent in constitutional interpretation." 90 F. Supp. 2d at 98. That argument might have some force if the historical evidence demonstrated that "the 1787 understanding of the Framers" was that citizens of the District would enjoy voting representation in Congress. In such an event, one could argue that the understanding of the Framers should trump the mistaken and contrary understanding of a later generation. As we explain at greater length below, however, the evidence from the Founding era is wholly consistent with the evident understanding of those who drafted and ratified the Twenty-Third Amendment. But whether or not the Twenty-Third Amendment is confirmatory of the original understanding, the question at issue here is not whether the nation should be bound by what happened to be the prevailing "understanding of the people adopting a constitutional amendment in 1961"; it is whether a particular understanding carries interpretive weight when it is embodied in the text of the Constitution itself. Fidelity to constitutional structure is a well-established canon of interpretation. *See, e.g.*, *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 414–15 (1819); *see generally* Charles L. Black, Jr., S*tructure and Relationship in Constitutional Law* (1969); Akhil Reed Amar, *Intratextualism*, 112 Harv. L. Rev. 747 (1999). Accordingly, we cannot agree with Judge Oberdorfer's contention that an understanding expressly and unambiguously codified in the text of one constitutional provision may be entirely ignored when interpreting a related constitutional provision. Regardless whether one looks to Article I or the Twenty-Third Amendment—and one should look to both—one arrives at the same result: participation in federal elections and representation in the national government, except where the Constitution expressly provides otherwise, is limited to the people of the "states."

It is clear, moreover, that the District is not a state. The District Clause itself makes that much plain, *see* U.S. Const. art. I, § 8, cl. 17, and the proposed bills do not purport to alter that fact. They do not, for example,

entitle District residents to choose two senators, an essential aspect of statehood. (The Framers did not merely give each state a right to be represented by two Senators; they deemed this aspect of the Great Compromise so sacrosanct that they included in Article V of the Constitution a provision that purports to foreclose the possibility of a constitutional amendment that would deprive any state of this right without its consent.) Nor would these bills limit Congress's authority to control the District's operations under the District Clause, even though states enjoy independent authorities pursuant to their own constitutions and do not, as the District does, derive their powers from congressional enactments. Instead, the bills seek only to make the District an independent congressional district, untied to any state, and on that basis to give its "people" the power to elect a voting member of the House.[3] But that is precisely what the text of the Composition Clause precludes.

Those who argue in favor of the proposed legislation's constitutionality contend that the broader purposes of the Constitution are best served by concluding that the Composition Clause would permit District residents to have voting representation in the House. They argue that "the right to vote

---

[3] The pending legislation's conspicuous refusal to treat the District as a state, even for purposes of representation in the House alone, is underscored by the provision limiting the District's representation in the House to a maximum of one member regardless of population. Section 2(b)(1) of both bills would amend 2 U.S.C. § 2a, which governs the apportionment of representatives, by inserting a new subsection (d), which would provide: "This section shall apply with respect to the District of Columbia in the same manner as this section applies to a State, except that the District of Columbia may not receive more than one Member under any reapportionment of Members." This provision raises serious constitutional concerns in its own right. Section 2 of the Fourteenth Amendment in relevant part provides: "Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed." Even assuming that Congress could by statute treat the District as a "state" for purposes of representation in the House, any such representation would be subject to the constitutional requirement that the number of representatives assigned to each state be allocated on the basis of population. The pending legislation would seem to violate that requirement, as it would provide that "the District of Columbia may not receive more than one Member under any reapportionment of Members." We note that, under each bill's non-severability provision, this constitutional infirmity would threaten to render the entire legislation invalid. *See* S. 160, § 6(a) ("If any provision of this Act or any amendment made by this Act is declared or held invalid or unenforceable, the remaining provisions of this Act and any amendment made by this Act shall be treated and deemed invalid and shall have no force or effect of law."); H.R. 157, § 4 (same).

is one of the most important principles of democracy." Viet D. Dinh & Adam H. Charnes, *The Authority of Congress to Enact Legislation to Provide the District of Columbia with Voting Representation in the House of Representatives* at 19 (Nov. 2004), https://www.dcvote.org/sites/default/files/upload/vietdinh112004.pdf ("Dinh & Charnes"); *see also id.* (noting that the right to vote is regarded as "a fundamental political right, because preservative of all rights" (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886)); *Adams*, 90 F. Supp. 2d at 73 (Oberdorfer, J., dissenting) ("'No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined.'" (quoting *Wesberry v. Sanders*, 376 U.S. 1, 17–18 (1964)). "Given these considerations," it is argued, "depriving Congress of the right to grant the District Congressional representation pursuant to the District Clause thwarts the very purposes on which the Constitution is based." Dinh & Charnes at 19.

As important as these constitutional purposes are, however, the fact that the plain terms of the Composition Clause give the people of the states, and only those electors, the right to choose House members is not surprising or at odds with the central purposes of the founding charter. The Framers clearly looked upon states as unusually important components of the constitutional structure. As much as they created the Constitution to forge a union, they regarded states as distinct and independent units of government that were to play key roles in choosing the elected officers of the federal government. As the Supreme Court has explained, the constitutional framework governing representation was carefully designed to protect the integrity of the states in our federal system. *See, e.g.*, *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 550–51 (1985) ("Apart from the limitation on federal authority inherent in the delegated nature of Congress' Article I powers, the principal means chosen by the Framers to ensure the role of the States in the federal system lies in the structure of the Federal Government itself. It is no novelty to observe that the composition of the Federal Government was designed in large part to protect the States from overreaching by Congress."). Indeed, the Constitution ensures that all states are on an equal footing out of respect for their independent status. *See Coyle v. Smith*, 221 U.S. 559, 573 (1911) ("[W]hen a new state is admitted into the Union, it is so admitted with all of the powers of

sovereignty and jurisdiction which pertain to the original states, and [] such powers may not be constitutionally diminished, impaired, or shorn away by any conditions, compacts, or stipulations embraced in the act under which the new state came into the Union, which would not be valid and effectual if the subject of congressional legislation after admission."); *cf*. U.S. Const. art. IV, § 3, cl. 1 (protecting against the possibility that the federal government might merge two states into one by providing that a new state may not "be formed by the junction of two or more states . . . without the consent of the legislatures of the states concerned as well as of the Congress"). In sum, we read the word "state" in the Composition Clause as denominating a unique and significant status that is exclusive of other constitutionally recognized political jurisdictions, such as the District, and that reading is entirely consistent with the constitutional structure. *See Adams*, 90 F. Supp. 2d at 49 (incongruity of giving Congress itself the authority to fill its own vacancies militates against theory that the District may be deemed a "state" for purposes of constitutional provisions governing representation).

Indeed, every Clause in the original Constitution addressing the qualifications of the electors for national office—whether members of the House, Senators, or the President—uses language that is similar to that in the Composition Clause. *See* U.S. Const. art. I, § 3, cl. 1 ("The Senate of the United States shall be composed of two Senators from each State, chosen by the Legislature thereof"); *id*. art. II, § 1 ("Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress" for purposes of electing the President). Here, too, the Twenty-Third Amendment is confirmatory. In providing that the District may play a role in the selection of the President, and thereby amending the rule established in Article II, Section 1 that presidential electors are appointed by "Each State" and meet in "their respective States," the Amendment specifically acknowledges that its provision for electors from the District is an exception to the constitutional rule that the states alone (and the people of those states) may be involved in determining the composition of the federal government. That states and states alone (and their people) are mentioned in the original composition provisions of the Constitution suggests a degree of intentionality on the part of the drafters that is hard to square with the conclusion

that the people of a non-state, such as the District or federal territories, may nonetheless exercise the power to choose members of the House. Simply put, the Constitution, in providing for the selection of the political branches of the national government, assigned a critical role to the independent states, which stand at arm's length from federal power in a way that no other constitutionally recognized political jurisdictions do.

In this regard, it is worth noting that the Constitution itself identifies a range of political entities—from tribes to enclaves to territories. Yet it is states and states alone that are referred to in the original provisions prescribing the selection of Senators, the President, and the members of the House. If the Composition Clause were not read in the exclusive manner we contend it must be, it would seem hard to argue that Congress could not pursuant to its similarly broad authority under the Territories Clause, U.S. Const. art. IV, § 3, cl. 2, provide all territories with representation in Congress. *See* Jonathan Turley, *Too Clever by Half: The Unconstitutionality of Partial Representation of the District of Columbia in Congress*, 76 Geo. Wash. L. Rev. 305, 362–64 (2008) (explaining why logic of providing congressional representation to the District also applies to the territories). It has been argued that the District is unique, so that even if Congress may by statute give the District voting representation in the House, that legislative authority would not necessarily extend to providing the territories and other non-state entities with such representation. *See, e.g.*, Dinh & Charnes at 21 n.103. But once one opens the word "state" up for interpretation to include the District, it is not at all clear what limiting principle could be identified, as a matter of text or history, that would preclude other non-state entities from fitting within the Composition Clause. At the limit, then, Congress would be able to overwhelm the representatives of the "people of the several states" with those representing political jurisdictions lacking the attributes of statehood.

To this point, our focus has been on arguments concerning the text of the Composition Clause and its relationship to the broader constitutional structure. The evidence we have reviewed from founding-era history, however, also supports our conclusion that Congress may not give the District voting representation in the House without making the District a state. *See generally Adams*, 90 F. Supp. 2d at 50–53. The District was created to serve the distinct purpose of protecting the national government and its institutions. It was a direct reaction to the fact that the Continental

Congress was effectively run out of Philadelphia by an angry mob and received little assistance from Pennsylvania. To ensure that the federal government would not be at the mercy of a state government's willingness to protect it in the future, it was determined that a special non-state federal district be established. *See id.* at 50 n.25. That particular purpose—maintaining the nation's capital as a non-state entity—obviously does not require that the District be denied voting representation in Congress. *See, e.g.*, Raven-Hansen, *Congressional Representation for the District of Columbia*, 12 Harv. J. on Legis. at 184. But Founding-era statements addressing the voting rights of residents of such a district—including statements from prospective district residents themselves—clearly reveal an understanding that citizens of the District would have no right to vote in national elections, as they were not residents of a state. *See, e.g.*, 10 Annals of Cong. 991, 998–99 (1801) (remarks of Rep. Dennis) (stating that because of District residents' "contiguity to, and residence among the members of [Congress]," "though they might not be represented in the national body, their voice would be heard"; "[b]ut if it should be necessary [that they be represented], the Constitution might be so altered as to give them a delegate to the General Legislature when their numbers should become sufficient"); *id.* at 992 (remarks of Rep. Bird) (assigning "blame" for disenfranchisement of District residents to "the men who framed the Constitutional provision, who peculiarly set apart this as a District under the national safeguard and Government"); 5 *The Papers of Alexander Hamilton* 189–90 (Harold C. Syrett ed., 1962) (reprinting text of subsequently rejected amendment proposed by Alexander Hamilton during the New York ratifying convention: "That When the Number of Persons in the District of Territory to be laid out for the Seat of the Government of the United States, shall according to the Rule for the Apportionment of Representatives and Direct Taxes Amount to [left blank] such District shall cease to be parcel of the State granting the Same, *and Provision shall be made by Congress for their having a District Representation in that Body*.") (emphasis added); *see also* 12 Annals of Cong. 487 (1803) (remarks of Rep. Smilie) ("Under the exercise of exclusive jurisdiction the citizens are deprived of all political rights, nor can we confer them."); 5 *The Documentary History of the Ratification of the Constitution* 621 (Merrill Jensen, John P. Kaminski & Gaspare J. Saladino eds., 1976) (statement of Samuel Osgood, delegate to the Massachusetts ratifying

convention, that he could accept the Seat of Government provision only if it were amended to provide that the District be "represented in the lower House," though no such amendment was ultimately included in the amendments recommended by the Massachusetts convention); *see generally Adams*, 90 F. Supp. 2d at 51–53 (recounting this history).

Some scholars and commentators have argued that certain pieces of evidence suggest a contrary understanding. In particular, some have pointed to the fact that, in the interim period between Congress's acceptance of the District and Congress's assumption of jurisdiction over the District, those living in the physical territory that would become the District were permitted to vote in Virginia or Maryland. *See, e.g.*, Arjun Garg, Note, *A Capital Idea: Legislation to Give the District of Columbia a Vote in the House of Representatives*, 41 Colum. J.L. & Soc. Probs. 1, 21 (2007). But at the time, such persons were still citizens of Virginia or Maryland, and thus this history does not show that the people of the District possessed voting rights that they have since lost. Instead, this history shows only that these persons' prospective status as District residents did not deprive them of the constitutionally conferred right as the "people" of one of the several states to choose members of the House under the Composition Clause. *See* Raven-Hansen, *Congressional Representation for the District of Columbia*, 12 Harv. J. on Legis. at 174 ("District residents did not lose state citizenship until December, 1800, and the prior decade of voting and representation provided no precedent for the representation of District citizens.").[4]

Nor is there any evidence that this original understanding was called into question over time. Although the movement to provide District citi-

---

[4] Professor Raven-Hansen argues that it was an act of Congress, and not the constitutional provisions limiting voting representation to "states," that disenfranchised citizens of the District. *See* Raven-Hansen, *Congressional Representation for the District of Columbia*, 12 Harv. J. on Legis. at 174–79. The evidence adduced for this proposition does not overcome the contrary indications in the constitutional text and history that a non-state entity may not enjoy voting representation in Congress. Indeed, the court in *Adams* considered this very evidence and concluded that "it *is* the Constitution itself that is the source of [the District's] voting disability." 90 F. Supp. 2d at 62 (emphasis in original); see also id. ("Thus, it was not the Organic Act or any other cession-related legislation that excluded District residents from the franchise, something we agree could not have been done by legislation alone.").

zens with some representation in the national legislature has a long historical pedigree, for most of the nation's history proponents of such a view "have assumed that District representation requires a constitutional amendment." *Id*. at 167. Thus, until very recently, no legislation comparable to that at issue here was even proposed, much less acted upon. Instead, members of Congress have consistently sought to give the District the right to vote in federal elections by way of at least three other devices: retrocession; statehood; and constitutional amendment. The history associated with such efforts, including the history underlying the adoption of the 23rd Amendment, demonstrates that Congress itself understood that the District is not a state and therefore may not enjoy voting representation in Congress. *See, e.g.*, *Providing Representation of the District of Columbia in Congress*, H.R. Rep. No. 90-819, at 4 (1967) ("If the citizens of the District are to have voting representation in the Congress, a constitutional amendment is essential; statutory action alone would not suffice. This is the case because provisions for elections of Senators and Representatives in the Constitution are stated in terms of the States, and the District of Columbia is not a State."); H.R. Rep. No. 86-1698 (noting that, absent a constitutional amendment, "voting rights are denied District citizens because the Constitution provides machinery only through the States for the selection of the President and Vice President," and observing that "apart from the Thirteen Original States, the only areas which have achieved national voting rights have done so by becoming States").[5]

---

[5] The Uniformed and Overseas Citizens Absentee Voting Act ("OCAVA") does not provide a legislative precedent for the proposition that Congress may give voting representation to a non-state entity such as the District. As supporters of the pending legislation have observed, *see, e.g.*, Dinh & Charnes at 17–18, one provision of the Act purports to give a U.S. citizen residing abroad the right to vote by absentee ballot in federal elections if that citizen once was domiciled in a state and, but for the fact of overseas residence, is otherwise qualified to vote in that state's elections. *See* 42 U.S.C. § 1973ff-1(a)(1) ("Each state shall . . . permit absent uniformed services voters and overseas voters to use absentee registration procedures and to vote by absentee ballot in general, special, primary, and runoff elections for Federal office."); *id*. § 1973ff-6(5)(C) (defining "overseas voter" to include, among others, "a person who resides outside the United States and (but for such residence) would be qualified to vote in the last place in which the person was domiciled before leaving the United States"). Assuming this particular aspect of the Act is constitutional—*compare Romeu v. Cohen*, 265 F.3d 118, 130–31 n.9 (2d Cir. 2001)

Notwithstanding clear and substantial evidence of the original under-standing that the District was not a state and therefore would not enjoy voting representation in Congress, some have argued that the Framers inadvertently neglected to provide for voting representation for the District. Because the absence of such representation did not and does not serve any valid purpose, they argue, Congress should for practical reasons be deemed to have the authority to correct this omission by statute. *See, e.g.*, Raven-Hansen, *Congressional Representation for the District of Columbia*, 12 Harv. J. on Legis. at 191 ("[D]enial of congressional repre-sentation to District residents was neither necessary to effect the constitu-tional purpose nor desired by those involved. Rather the problem was not clearly perceived until the damage was done."); *see also* Dinh & Charnes at 7 & n.22; *Adams*, 90 F. Supp. at 87 (Oberdorfer, J., dissenting) ("As the Supreme Court has explained, 'The "exclusion" is often the result of inadvertence or accident, and the [*expressio unius est exclusio alterius*] maxim ought not to be applied, when its application, having regard to the subject-matter to which it is to be applied, leads to inconsistency or injus-tice.'") (citation and quotation marks omitted).

This argument is unpersuasive. First, the constitutional text limiting representation in Congress to states "is not a case where '[t]he "exclu-

---

(Leval, J.), with *id*. at 134 n.7 (Walker, C.J., concurring); *see also* Memorandum for John R. Bolton, Assistant Attorney General, Office of Legislative Affairs, from Douglas W. Kmiec, Assistant Attorney General, Office of Legal Counsel, *Re: H.R.4393, 99th Cong., The Uniformed and Overseas Citizens Absentee Voting Act* (Aug. 22, 1986) ("The bill raises on its face serious questions about the proper relations between the Federal gov-ernment and the States in the delicate area of voting rights."); Dinh & Charnes at 18 n.89 ("Since the [Act] was enacted in 1986, the constitutional authority of Congress to extend the vote to United States citizens living abroad has never been challenged.")—such a precedent would at most suggest that Congress might have the authority to give some citizens of the District (those who used to live in one of the states and would be qualified to vote in that state's elections but for the fact of their residence in the District) the right to vote in that state's elections for federal officers. *Cf. Romeu*, 265 F.3d at 129. Because the OCAVA does not treat U.S. citizens living abroad as part of a non-state entity entitled to its own representation in Congress, the Act cannot be cited as evidence that Congress may create freestanding congressional districts that do not belong to any state but never-theless enjoy representation in the national legislature. *Cf. Att'y Gen. of Guam v. United States*, 738 F.2d 1017, 1020 (9th Cir. 1984) ("The OCAVA does not evidence Congress's *ability* or intent to permit all voters in Guam elections to vote in presidential elections.") (emphasis added).

sion" is . . . the result of inadvertence or accident.'" *Adams*, 90 F. Supp. 2d at 56 (citation and quotation marks omitted). To the contrary, "[t]he Constitution's repeated references to states . . . are reflections of the Great Compromise forged to ensure the Constitution's ratification. There is simply no evidence that the Framers intended that not only citizens of states, but unspecified others as well, would share in the congressional franchise." *Id.*; *see also D.C. Voting Rights Act*, 31 Op. O.L.C. at 150 (provisions governing the composition of Congress "were the very linchpin of the Constitution, because it was only by reconciling the conflicting wishes of the large and small States as to representation in Congress that the Great Compromise that enabled the Constitution's ratification was made possible").

Second, even if were true that the Framers inadvertently neglected to give the District voting representation, it does not follow that they would have intended to give Congress the power by simple majority vote to manipulate the membership of the national legislature. We have not found any evidence suggesting that the Framers thought Congress would or should have such authority, and the centrality of the Great Compromise in the drafting of the Constitution cuts the other way. *See D.C. Voting Rights Act*, 31 Op. O.L.C. at 152 ("Given the great care with which the Framers provided for State-based congressional representation in the Composition Clause and related provisions, it is implausible to suggest that they would have simultaneously provided for the subversion of those very provisions by giving Congress carte blanche to create an indefinite number of additional seats [representing the territories and the federal enclaves] under the [District] Clause.").

Finally, proponents of the pending legislation argue in support of its constitutionality by appealing to judicial precedent. Their primary contention is that affirmative precedent for their position exists in cases considering the District Clause, and we discuss this line of argument at considerable length in the next section. The proponents are less forceful, however, in contending that there is affirmative support for their position in precedents interpreting the Composition Clause itself. Here, as we explain, the available precedent is entirely consistent with the conclusion that the Clause excludes non-state entities such as the District and provides no meaningful support for the contrary position.

Most recently, in a thorough and thoughtful opinion, a three-judge pan-el of the United States District Court for the District of Columbia (with Judges Garland and Kollar-Kotelly in the majority and Judge Oberdorfer dissenting) concluded that "the clauses of Article I that provide for con-gressional voting [] are not applicable to residents of the District of Co-lumbia." *Adams*, 90 F. Supp. 2d at 65. The Supreme Court summarily affirmed the ruling in *Adams*, turning aside the District's argument that Article I, Section 2 should be construed, in accord with broader democrat-ic principles and purposes of the Constitution, to allow District citizens to vote for a congressional representative. *See Alexander v. Mineta*, 531 U.S. 940 (2000); *see also Hicks v. Miranda*, 422 U.S. 332, 344–45 (1975) (summary affirmance is a precedential ruling on the merits).[6] Because *Adams* addressed the question whether the Constitution requires giving the District representation, the court's decision in that case does not directly answer whether Congress might have the authority to confer such electoral authority by legislation. *See D.C. Voting Rights Act*, 31 Op. O.L.C. at 149 (emphasizing that "the courts have not directly reviewed the constitutionality of a statute purporting to grant the District representation because . . . Congress has not previously considered such legislation constitutionally permissible"). Proponents emphasize that point by way of suggesting that *Adams* is not of great significance as to whether Congress

---

[6] In its appeal to the Supreme Court, the District of Columbia and 54 residents of the District specifically contended (as the *Adams* plaintiffs in the companion case did not) that citizens of the District have a constitutional right "to be counted as 'People of the several States' for purposes of congressional representation" under Article I, Section 2. Jurisdictional Statement at 10, *Alexander v. Daley*, 531 U.S. 940 (No. 99-2062). The Solicitor General, on behalf of the federal Appellees, devoted virtually all of his Motion to Affirm to the argument that citizens of the District are not among the "People of the several States" under Article I, Section 2; and, in responding to the District's primary argument "that the Court should 'reject[] the most literal reading of a constitutional provision in favor of one that is more harmonious with the principles enunciated by the document as a whole and in keeping with its underlying purposes,'" the Solicitor General argued that "[d]eparting from the 'most literal reading' of the constitutional text in this case would . . . lead to insurmountable textual difficulties and conflict with both historical evidence and judicial precedent." Motion to Affirm at 10–11, *Alexander v. Mineta*, 531 U.S. 940 (No. 99-2062). The Supreme Court summarily affirmed the decision of the three-judge court in *Adams*, a decision that included the holding that the citizens of the District are not among the "People of the several States" for purposes of Article I, Sec-tion 2.

may provide voting representation to the District. In fact, however, the *Adams* court conducted an exhaustive analysis of the Composition Clause itself and concluded that its references to "states" exclude the District from its scope. *Adams*, 90 F. Supp. 2d at 62 (rejecting argument that congressional legislation disenfranchised citizens of the District, concluding that "it *is* the Constitution itself that is the source of plaintiffs' voting disability," and noting that "it was not the Organic Act or any other cession-related legislation that excluded District residents from the franchise, something we agree could not have been done by legislation alone") (emphasis in original). Nor did the court suggest that the issue was close. *See id.* at 56 ("[T]he overlapping and interconnected use of the term 'state' in the relevant provisions of Article I, the historical evidence of contemporary understandings, and the opinions of our judicial forebears all reinforce how deeply Congressional representation is tied to the structure of statehood. The Constitution's repeated references to states cannot be understood . . . as merely the most practical method then available for holding elections. . . . There is simply no evidence that the Framers intended that not only citizens of states, but unspecified others as well, would share in the Congressional franchise.").

Moreover, there are additional dicta in other cases indicating that Congress cannot either expand the constitutional definition of "state" for purposes of the Composition Clause or invoke one of its enumerated authorities to avoid the strictures of that Clause by giving the District some of the voting representation that the Constitution affords only to the states. *See, e.g.*, *Michel v. Anderson*, 623 F.3d 623, 630 (D.C. Cir. 1994) (holding that House rule giving delegates from non-state entities authority to cast certain non-decisive votes did not make those delegates "members" of the House for purposes of the Composition Clause, but stating in dictum that the Clause "precludes the House from bestowing the characteristics of membership on someone other than those 'chosen every second Year by the People of the several States'"); *Adams*, 90 F. Supp. 2d at 50 ("[T]he Constitution does not contemplate that the District may serve as a state for purposes of the apportionment of congressional representatives."); *Michel v. Anderson*, 817 F. Supp. 126, 140 (D.D.C. 1993) ("One principle is basic and beyond dispute. Since the Delegates do not represent States but only various territorial entities, they may not, consistently with the Constitution, exercise legislative power (in tandem with the

United States Senate), for *such power is constitutionally limited* to 'Members chosen . . . by the People of the several States.'") (emphasis added); *see also Banner v. United States*, 428 F.3d 303, 309 (D.C. Cir. 2005) (stating that the "Constitution denies District residents voting representation in Congress") (emphasis added).

As noted above, the Supreme Court in *Adams* affirmed the District Court's holding that the District of Columbia is not a "state" within the meaning of the Composition Clause. The Court has not had occasion to address whether Congress may by statute give the District voting representation in the House even though the District is not a "state" for purposes of the Composition Clause. But insofar as it has discussed the issue in dicta, it has without exception expressed the view that the District may not choose elected federal officials, other than where expressly provided, because it is not a state. *See Loughborough*, 18 U.S. at 324 (stating that the District "voluntarily relinquished the right of representation"); *Hepburn & Dundas v. Ellzey*, 6 U.S. (2 Cranch) 445, 452–53 (1805) (suggesting in dictum that the District is not a state for purposes of the Composition Clause).

We have not found any judicial authority suggesting, even in dictum, that Congress might by statute treat the District as a state for purposes of federal enfranchisement and representation in the House. The absence of any such suggestion is revealing, particularly in those cases where courts have acknowledged that the lack of voting representation for the District is at odds with the nation's democratic principles. *See, e.g.*, *Loughborough*, 18 U.S. at 324 (conceding that "in theory it might be more congenial to the spirit of our institutions to admit a representative from the district," but omitting any suggestion that Congress might provide such representation by simple legislation); *Adams*, 90 F. Supp. 2d at 66 ("We do not disagree that defendants have failed to offer a compelling justification for denying District residents the right to vote in Congress.").

## II.

Proponents of the legislation advance two main arguments against this formidable body of authority for the proposition that the Composition Clause precludes giving the District voting representation in the House. Each rests on a contention about Congress's authority under the District

Clause, U.S. Const. art. I, § 8, cl. 17, which gives Congress the power to "exercise exclusive legislation in all cases whatsoever" over the District. We address each of these arguments in turn.

The first argument would read the District Clause to, in effect, trump the seemingly plain command of the Composition Clause. Proponents of this argument begin with the premise that the District Clause "grants Congress plenary and exclusive authority to legislate in all matters concerning the District." Dinh & Chames at 4. "This broad legislative authority," they contend, "extends to the granting of Congressional voting rights for District residents," regardless whether the District is a state within the meaning of the Composition Clause. *Id*.

Pursuant to the District Clause, Congress has broad authority to "exercise all the police and regulatory powers which a state legislature or municipal government would have in legislating for state or local purposes." *Palmore v. United States*, 411 U.S. 389, 397 (1973). Congress's power under the Clause has been described as "plenary." *Id*. But what this means is simply that Congress has "all legislative powers that the legislature of a state might exercise within the state." *Capital Traction Co. v. Hof*, 174 U.S. 1, 5 (1899).[7] As courts have repeatedly stressed, Congress's broad power to provide for the governance of the District does not give it the authority to "contravene any provision of the Constitution." *Palmore*, 411 U.S. at 397 (quoting *Hof*, 174 U.S. at 5); *see also Neild v. Dist. of Columbia*, 110 F.2d 246, 249 (D.C. Cir. 1984) ("Subject only to those prohibitions of the Constitution which act directly or by implication upon the federal government, Congress possesses full and unlimited jurisdiction to provide for the general welfare of citizens within the District of Columbia by any and every act of legislation which it may deem conducive to that end.") (emphasis added).

Therefore, for example, the power of Congress in the District of Columbia is limited by the individual rights guarantees of the Federal Constitution: Congress's District Clause power does not give it the authority to pass a bill of attainder or an ex post facto law, to dispense with trial by jury, to establish a religion, or to abridge the freedom of speech. *See*

---

[7] The word "exclusive" in the clause is to specify that the legislative power of Congress over the District is not concurrent with that of the ceding states. *See Dist. of Columbia v. John R. Thompson Co.*, 346 U.S. 100, 109 (1953).

*Keller v. Potomac Elec. Co.*, 261 U.S. 428, 443 (1923) ("Subject to the guaranties of personal liberty in the amendments and in the original Constitution, Congress has as much power [under the District Clause] to vest courts of the District with a variety of jurisdiction and powers as a state legislature has in conferring jurisdiction on its courts."). Nor can Congress invoke its power under the District Clause to alter the structural provisions of the Constitution, as *Keller* itself demonstrates. *See* 261 U.S. at 444 (holding that the District Clause does not give Congress the authority to vest "legislative or administrative jurisdiction" pertaining to the governance of the District in Article III courts). Likewise, Congress may not use its power to govern the District, no matter how "plenary" that authority may be, to alter the constitutional prerequisites for representation in the national legislature itself—prerequisites that include the command that members of the House are to be chosen "by the people of the several states."

Proponents of the pending legislation argue, in the alternative, and more persuasively, that even if the District Clause does not give Congress the power to act in direct contradiction of an express constitutional limitation or requirement, such as the one we believe is established by the Composition Clause, the District Clause does give Congress the more limited power to enact "legislation treating the District as a state, even for constitutional purposes." Dinh & Charnes at 4. In support of this argument, proponents of the legislation note that the term "state" may in some contexts be interpreted to include the District. *See Dist. of Columbia v. Carter*, 409 U.S. 418, 420 (1973) ("Whether the District of Columbia constitutes a 'State or Territory' within the meaning of any particular statutory or constitutional provision depends upon the character and aim of the specific provision involved."). Therefore, they argue, Congress should at the very least be permitted to treat the District as a state for purposes of the Composition Clause, particularly given that doing so would enfranchise citizens of the United States who would otherwise be denied the right to vote for a voting member of the House.

The most relevant case concerning Congress's authority under the District Clause, and the case on which proponents of the pending legislation most heavily rely, is *National Mutual Insurance Co. v. Tidewater Transfer Co.*, 337 U.S. 582 (1949). There, a fractured court held that Congress may give Article III courts jurisdiction over suits brought by citizens of

the District of Columbia against citizens of the several states, even if those suits do not involve a federal question or any of the other non-diversity-related heads of federal jurisdiction spelled out in section 2 of Article III. One of the four opinions in the case, authored by Justice Jackson and joined by two other Justices, concluded that Congress could use its authority under the District Clause to authorize Article III courts to hear such cases, even though, in Justice Jackson's view, such jurisdiction was not part of the federal judicial power as defined in Article III. *See id*. at 588, 600. Two other Justices concurred in the judgment but specifically rejected Jackson's broad view of Congress's power under the District Clause; those two justices would have upheld the statute on the ground that by operation of the Constitution itself the District is a state for purposes of the provision of Article III that extends the federal judicial power to controversies between citizens of different "states." *See id*. at 604–06, 625–26 (Rutledge, J., concurring). Unlike Justice Jackson's plurality opinion, Justice Rutledge's opinion argued that the statute at issue was constitutional by rejecting the Court's longstanding view regarding the meaning of the term "state" for purposes of the diversity jurisdiction provision of Article III. *See Hepburn & Dundas v. Ellzey*, 6 U.S. (2 Cranch) 445 (1805) (holding that statute giving federal courts jurisdiction over disputes between citizens from different states did not give those courts jurisdiction over a case between a citizen of the District and a citizen of one of the several states, based on conclusion in dictum that the meaning of the term "state" as used in Article III and other constitutional provisions did not include the District).

At first glance, the Jackson opinion might seem to provide a precedent for holding that Congress may use its power under the District Clause to give citizens of the District representation in Congress. His opinion was the only one in the majority to attract as many as three votes (including his own). Moreover, that opinion reasoned that the statute at issue in *Tidewater Transfer* effectively added an additional head of federal jurisdiction to those specifically enumerated in Article III. If Congress's power to legislate for the District may be used to expand the scope of federal jurisdiction under Article III, proponents of voting representation for District residents in the House have suggested, it should be reasonable to suppose that the same power may likewise be used to expand the basis of voting representation in Congress under Article I. Indeed, legislation

giving citizens of the District voting representation would seem to right a much more serious wrong, and to vindicate a much more fundamental principle, than the law at issue in *Tidewater Transfer*. *Compare id*. at 651 (Frankfurter, 1., dissenting) ("Concededly, no great public interest or libertarian principle is at stake in the desire of a corporation which happens to have been chartered in the District of Columbia, to pursue its claim against a citizen of Maryland in the federal court in Maryland on the theory that the right of this artificial citizen of the District of Columbia cannot be vindicated in the State courts of Maryland."), *with Wesberry v. Sanders*, 376 U.S., 17–18 (1964) ("No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined."); *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886) ("the political franchise of voting . . . is regarded as a fundamental political right, because preservative of all rights").

Framed at a high level of generality, then, the analogy to the Jackson opinion in *Tidewater Transfer* seems both appealing and superficially plausible. On deeper analysis, however, it becomes clear that the Jackson opinion in *Tidewater Transfer* does not provide persuasive authority for the constitutionality of the pending legislation.

Most importantly, the rationale underlying Justice Jackson's opinion is not a controlling holding of the Court. Six Justices in *Tidewater Transfer* expressly rejected Justice Jackson's theory that Congress's power to legislate under the District Clause enables it either to give content to, or else to circumvent the constraints of, the term "state" as used in a constitutional provision.[8] Given that two-thirds of the Justices in *Tidewater*

---

[8] *See id*. at 605 (Rutledge, J., concurring, joined by Justice Murphy) ("The Constitution is not so self-contradictory. Nor are its limitations to be so easily evaded."); *id*. at 607 ("I think that the Article III courts in the several states cannot be vested, by virtue of other provisions of the Constitution, with powers specifically denied them by the terms of Article III."); *id*. at 626 ("I am not in accord with the proposed extension of 'legislative' jurisdiction under Article I for the first time to the federal district courts outside the District of Columbia organized pursuant to Article III, and the consequent impairment of the latter Article's limitations upon judicial power . . . . That extension, in my opinion, would be the most important part of today's decision, were it accepted by a majority of the Court. It is a dangerous doctrine which would return to plague both the district courts

*Transfer* disapproved the Jackson rationale, the case cannot be said to hold that Jackson's theory is valid. *See The Congressional Pay Amendment*, 16 Op. O.L.C. 87, 93 n.11 (1992) (explaining that when the Supreme Court issues a splintered decision, an opinion does not constitute the holding of the case unless it "'embod[ies] a position implicitly approved by at least five Justices who support the judgment'") (quoting *King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991)); *cf. Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 66 (1996) (previous decision was of "questionable precedential value, largely because a majority of the Court expressly disagreed with the rationale of the plurality"). It therefore is not surprising that, as far as we are aware, no court has ever relied on Justice Jackson's opinion as the holding of the case, or as precedential authority for the proposition that Congress may, in other contexts, invoke its power under the District Clause to circumvent otherwise applicable constitutional constraints.[9]

Moreover, even if Justice Jackson's opinion were of some precedential effect, two aspects of the reasoning of that opinion suggest that it would not extend to support Congress's use of its power under the District Clause to alter the structure of congressional representation.

---

and ourselves in the future, to what extent it is impossible to say."); *id*. (Vinson, J., dissenting, joined by Justice Douglas) ("I agree with the views expressed by Mr. Justice Frankfurter and Mr. Justice Rutledge which relate to the power of Congress under Art. I of the Constitution to vest federal district courts with jurisdiction over suits between citizens of States and the District of Columbia."); *id*. at 652 (Frankfurter, J., dissenting, joined by Justice Reed) ("To find a source for 'the judicial Power,' therefore, which may be exercised by courts established under Article III of the Constitution outside that Article would be to disregard the distribution of powers made by the Constitution."); *id*. at 655 ("[T]he cases to which jurisdiction may be extended under Article III to the courts established under it preclude any claim of discretionary authority to add to the cases listed by Article III or to change the distribution as between original and appellate jurisdiction made by that Article.").

[9] Shortly after *Tidewater Transfer*, courts characterized that case as holding only that the statute at issue in that case was constitutional—not that the statute was permissible as an exercise of Congress's authority under the District Clause. *See, e.g.*, *Siegmund v. Gen. Commodities Corp.*, 175 F.2d 952, 953 (9th Cir. 1949) ("The *National Mutual* case upheld the constitutionality of the Act involved here as applied to an action between a citizen of the District of Columbia and a citizen of a state."); *accord Detres v. Lions Bldg. Corp.*, 234 F.2d 596, 603 (7th Cir. 1956) (adopting *Siegmund*'s understanding of "what was actually held by the Supreme Court" in *Tidewater Transfer*).

First, Justice Jackson repeatedly stressed that Congress's decision to extend diversity jurisdiction to cases involving citizens of the District would not "substantially disturb the balance between the Union and its component states." *Tidewater Transfer*, 337 U.S. at 585. Nor, perhaps, would a mere addition to the number of representatives in Congress compromise that balance. But a law expanding the categories of representation in Congress to include non-state entities would implicate the "balance between the Union and its component states" to a much greater extent than the extension of diversity jurisdiction to cases involving District residents. *See id.* ("This constitutional issue affects only the mechanics of administering justice in our federation. It does not involve an extension or a denial of any fundamental right or immunity which goes to make up our freedoms."); *see also Adams*, 90 F. Supp. 2d at 56 ("[T]he overlapping and interconnected use of the term 'state' in the relevant provisions of Article I, the historical evidence of contemporary understandings, and the opinions of our judicial forebears all reinforce how deeply Congressional representation is tied to the structure of statehood."); *D.C. Voting Rights Act*, 31 Op. O.L.C. at 150 (provisions governing the composition of Congress "were the very linchpin of the Constitution, because it was only by reconciling the conflicting wishes of the large and small States as to representation in Congress that the Great Compromise that enabled the Constitution's ratification was made possible"). Thus, the rationale of the Jackson opinion, by its own terms, would not seem to encompass the pending legislation.

Second, Justice Jackson relied upon on a pragmatic argument for extending diversity jurisdiction that would not apply here. In particular, Justice Jackson assigned great weight to the fact that Congress concededly enjoyed analogous authority that as a practical matter was indistinguishable from the power at issue in the case. As Justice Jackson explained, the parties agreed that Congress could use its Article I power to create courts, located inside and outside the District, with jurisdiction over cases between citizens of the District and citizens of the several states. The only question, then, was whether Congress had to create two distinct categories of courts across the country—one consisting of Article I courts empowered to hear diversity cases involving residents of the District, and one consisting of Article III courts authorized to hear all other cases. Justice Jackson saw no good reason for forcing Congress to maintain two sepa-

rate systems; in his view, practical reasons supported the conclusion that Congress had discretion to combine both functions in the same courts. *See id*. at 585, 602. The statute Congress enacted in that case, in other words, had very little practical effect, in light of other statutes that Congress concededly could have enacted.[10] Giving residents of the District voting representation in Congress, however, is not analogous in this respect; here, unlike in *Tidewater Transfer*, it is very much disputed whether Congress has any authority to alter by simple legislation the structure of congressional representation.

Justice Rutledge's two-Justice opinion also cannot be relied upon as authority to support this legislation. It, too, was adopted by a minority of the Court, and the theory itself was rejected by the remaining seven Justices. Moreover, Justice Rutledge's theory—that the constitutional provision conferring diversity jurisdiction included the District in its reference to cases between citizens of different "states"—was clause-specific and, as he himself explained, would not extend to the meaning of the term "state" as used in the Composition Clause. *Id*. at 619, 623 (Rutledge, J., concurring) (concluding that the term "state," as used in the Article III provision providing for diversity jurisdiction, should be understood to include the District, but suggesting that the term should not be so defined for purposes of constitutional provisions "relating to the organization and structure of the political departments of the government," expressly including the provisions of Article I pertaining to the composition of Congress).

---

[10] *See id*. at 602 ("We could not of course countenance any exercise of this plenary power [under the District Clause] either within or without the District if it were such as to draw into congressional control subjects over which there has been no delegation of power to the Federal Government. But as we have pointed out, the power to make this defendant suable by a District citizen is not claimed to be outside of federal competence. If Congress has power to bring the defendant from his home all the way to a forum within the District, there seems little basis for denying it power to require him to meet the plaintiff part way in another forum. The practical issue here is whether, if defendant is to be suable at all by District citizens, he must be compelled to come to the courts of the District of Columbia or perhaps to a special statutory court sitting outside of it, or whether Congress may authorize the regular federal courts to entertain the suit. We see no justification for holding that Congress in accomplishing an end admittedly within its power is restricted to those means which are most cumbersome and burdensome to a defendant.").

While acknowledging that neither Justice Jackson's view of Congress's power under the District Clause nor Justice Rutledge's view of the meaning of state in Article III commanded the support of a majority of the Court, some commentators argue that "[t]he significance of *Tidewater*" to pending legislative efforts to give the District voting representation in the House "is that the five justices concurring in the result believed either that the District was a state under the terms of the Constitution or that the District Clause authorized Congress to enact legislation treating the District as a state." Dinh & Charnes at 13; *see also* Hatch, *No Right is More Precious*, 45 Harv. J. on Legis. at 301 (quoting *The Authority of Congress to Enact Legislation to Provide the District of Columbia with Voting Representation in the House of Representatives: Hearing Before the H. Comm. On Government Reform*, 108th Cong. 13 (2004) (statement of Viet D. Dinh, Professor, Georgetown University Law Center, and Adam Charnes, Partner, Kilpatrick Stockton L.L.P.)). On this view, the Court might rely on *Tidewater Transfer* in justifying a decision to reach the similar conclusion that the Composition Clause either implicitly includes the District as one of several "states" or at least does not necessarily bar Congress from exercising its authority under the District Clause to treat it as a state for purposes of that clause.

This argument fails, we believe, for a number of reasons. As we have explained, both theories supporting the particular statute in *Tidewater Transfer* were rejected by a majority of the Court in that case, and thus neither is part of the holding of the case. The fact that at one particular point in time five of the nine Justices then sitting on the Court would have embraced one of the two theories—although no more than three Justices accepted either one—does not mean that either theory can be viewed as governing authority in a different context. Indeed, each of the opinions from *Tidewater Transfer* that arguably provides support rested on a theory that, by its own terns, would not cover the Composition Clause, given its important function in establishing the nation's political structure. In sum, *Tidewater Transfer* does not provide authority in support of the constitutionality of the pending legislation. Six of the nine Justices in the case unambiguously rejected the theory that the District Clause might be used to circumvent constitutional constraints on the scope of federal judicial power; and the remaining three Justices, so far as one can tell from the reasoning set forth in their opinion, most likely would not have approved

the substantial extension of their theory that would be needed to sustain the constitutionality of the legislation at issue here. Rather, the most that can be said in support of the *Tidewater Transfer* analogy is that Justice Jackson's opinion articulates a theory that would offer a plausible basis for the pending legislation if that theory, in either *Tidewater Transfer* or later cases, had been (1) accepted as valid constitutional doctrine and (2) extended in a way Justice Jackson very likely would not have approved.

Although commentators arguing that Congress may statutorily grant the District voting representation in the House rely largely on *Tidewater Transfer*, they do also cite a number of other cases. They contend these cases support the proposition that Congress's power under the District Clause allows it, by statute, to treat the District as a state for purposes of various constitutional provisions. *See, e.g.*, Dinh and Charnes at 9–17 (discussing cases and concluding that "Congress can legislate to treat the District as a state for purposes of Article I representation" even though "[t]he District is not a state for purposes of . . . Article I, section 2, clause 1"); Hatch, *No Right is More Precious*, 45 Harv. J. on Legis. at 300 (citing cases for proposition that "Congress may extend to the District through legislation what the Constitution applies to the states"); Garg, *A Capital Idea*, 41 Colum. J.L. & Soc. Probs. at 20 ("In various instances in which the District or its residents have asserted rights under the Constitution, courts have held that this specific constitutional grant of congressional authority over the District is so strong that it trumps the ordinary application of other constitutional provisions."); Lawrence M. Frankel, Comment, *National Representation for the District of Columbia: A Legislative Solution*, 139 U. Pa. L. Rev. 1659, 1679–83 (1991) (same).

None of the Supreme Court cases cited by those commentators, however, holds or implies that Congress's power to legislate for the District gives it the authority to define the term "state" to include the District for purposes of any particular constitutional provision (let alone Article I, Section 2). Nor can any of those cases be cited for the proposition that Congress's power under the District Clause enables it to circumvent otherwise applicable constitutional constraints. Some of the cases cited by supporters of the pending legislation stand for the unremarkable proposition that the term "state," as used in certain statutes and treaties, should be understood to include the District. *See, e.g.*, *Geofroy v. Riggs*, 133 U.S. 258, 272 (1890) (holding that the District is one of "the States of the

Union" for purposes of a particular consular convention with France).[11] Other of the cases on which the proponents of the legislation rely arguably imply that the term "state," as used in constitutional provisions other than those governing the composition of the House, includes the District independent of any congressional action. *See, e.g.*, *Stoutenburgh v. Hennick*, 129 U.S. 141, 148–49 (1889) (holding that Congress did not purport to delegate to the local government of the District the power to regulate interstate commerce but arguably proceeding on the assumption that the District is a state within the meaning of the Commerce Clause); *Callan v. Wilson*, 127 U.S. 540, 548–51 (1888) (holding that citizens of the District are covered by the constitutional provisions concerning the right to a jury trial in criminal cases). Because, as noted above, the District is not a "state" for purposes of Section 2 of Article I, these latter authorities, concerning distinct constitutional provisions not "relating to the organization and structure of the political departments of the government," *Tidewater Transfer*, 337 U.S. at 619, do not support the constitutionality of the pending legislation.

Our understanding of the scope of Congress's authority under the District Clause is also wholly consistent with *Loughborough v. Blake*, 18 U.S. 317 (1820). In that case, the Court held that Congress has the authority to impose a direct tax on the District of Columbia. Section 2 of Article I provides that "direct taxes shall be apportioned among the several states which may be included within this Union, according to their respective numbers." Because the District is not a "state," it was argued in Loughborough that Congress lacked the power to tax citizens of the District. The Court rejected this contention because other provisions of the Constitution give Congress broad power to lay taxes and do not say or

---

[11] Some other cases on which commentators rely hold that the District is not a state within the meaning of certain statutes. *Dist. of Columbia v. Carter*, 409 U.S. at 419 ("[W]e hold that the District of Columbia is not a 'State or Territory' within the meaning of § 1983."); *Hepburn & Dundas*, 6 U.S. at 452–53 (holding that the District was not a state within the meaning of the statute conferring diversity jurisdiction and reasoning that the clause governing the composition of the House provides evidence that "the members of the American confederacy only," as distinguished from the District, "are the states contemplated in the constitution"). Those cases plainly do not support the proposition that Congress can treat the District as a state for purposes of a constitutional provision that does not, by operation of the Constitution itself, embrace the District.

imply that such taxes may be imposed only on the states. *See* U.S. Const. art. I, § 8, cl. 1 ("The Congress shall have power to lay and collect taxes[.]"); *id*. cl. 17 (Congress has power to "exercise exclusive legislation in all cases whatsoever" over the District). The purpose of the apportionment provision of section 2 of Article I, the Court concluded, was "to furnish a standard by which taxes are to be apportioned, not to exempt from their operation any part of our country." *Loughborough*, 18 U.S. at 320. Accordingly, the Court held that "Congress possesses, under the constitution, the power to lay and collect direct taxes within the District of Columbia, in proportion to the census directed to be taken by the constitution." *Id*. at 325. As the foregoing summary makes clear, Loughborough cannot reasonably be read to stand for the proposition that Congress can, by simple legislation, bring the District within the ambit of the term "state" for purposes of a constitutional provision that does not of its own force include the District. Indeed, the Court in *Loughborough* concluded that the District "has voluntarily relinquished the right of representation," *id*. at 324–25, and nothing in its discussion of that issue suggests that Congress could give by statute what, in the Court's view, the Constitution had taken away.

Defenders of the legislation also point to lower-court cases that they argue demonstrate Congress's authority to treat the District as a state for the purposes of the Constitution. *See Milton S. Kronheim & Co. v. Dist. of Columbia*, 91 F.3d 193 (D.C. Cir. 1996); *Clarke v. Wash. Metro. Area Transit Auth.*, 654 F. Supp. 712, 714 n.1 (D.D.C. 1985), *aff'd*, 808 F.2d 137 (D.C. Cir. 1987). Those cases do not, however, address the question whether the District can be treated as a state for purposes of Article I, Section 2, a provision that implicates the special concerns relating to the political structure of the federal government that both Justices Jackson and Rutledge singled out in their *Tidewater Transfer* opinions. Moreover, the provisions at issue in these lower-court cases, the Eleventh and Twenty-first Amendments, also differ from the Composition Clause. Not only do they have different constitutional texts (e.g., "[t]he transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited"), but their legal effect is very different, as well. The Composition Clause is the exclusive source of the benefit it confers: Unless an entity can be deemed a state, there is no plausible basis

for it having voting representation in the House. By contrast, neither the Eleventh Amendment nor the Twenty-First is the exclusive source of the benefits they confer. Even without "treating" the District as a state, Congress could grant the District immunity from suit, or confer on the District the power to regulate the use of alcohol. For this reason, there could be no argument that Congress's action in either *Kronheim* or *Clarke* "contravene[d] any provision of the Constitution." *Palmore*, 411 U.S. at 397.

In sum, we conclude that Congress may not by statute give the District of Columbia voting representation in the House. The relevant constitutional text, original understanding, subsequent history, and judicial precedent—including a recent summary affirmance by the Supreme Court—all clearly support the proposition that the District is not a "state" within the meaning of the Composition Clause. The District Clause gives Congress broad power to legislate for the District, but it does not permit Congress to override the prescriptions of the Composition Clause.[12]

---

[12] Our analysis addresses the most fundamental problem with the pending legislation, which is that Congress may not by statute give the District voting representation in the House without making the District a state. We note that, in addition to this fundamental problem, another provision of the Senate bill raises additional concerns. Section 3(c)(l) of S. 160 would require the President to "transmit a revised version of the most recent statement of apportionment . . . to take into account this Act and identifying the State of Utah as the State entitled to one additional Representative pursuant to this provision." This provision raises potential constitutional concerns of its own. As noted above, section 2 of the Fourteenth Amendment provides that "Representatives shall be apportioned among the several States according to their respective numbers." Although Congress may by law expand the total number of Representatives in the House, the constitutional requirement that those representatives be allocated on the basis of population could be construed to preclude Congress from directing that additional representatives be assigned to a particular state. This constitutional concern could be addressed by replacing the language quoted above with the language used in the House bill, which requires the President to submit a report "identifying the State (other than the District of Columbia) which is entitled to one additional Representative pursuant to this section." H.R. 157, § 3(c)(2). The fix we have suggested for this particular provision would not, however, address the broader constitutional problem with the bill.